**UNITED STATES of America,
Plaintiff,**

v.

**GOVERNMENT OF THE VIRGIN
ISLANDS, Defendant.**

**No. CIV.84–104.**

District Court, Virgin Islands,
D. St. Thomas and St. John.

March 10, 2003.

David Nissman, Esq., United States Attorney, William Dillon, Esq., Special Assistant United States Attorney, David Lewis, Esq., Assistant United States Attorney, Donald G. Frankel, Esq., U.S. Department of Justice, for the plaintiff.

Iver A. Stridiron, Esq., Attorney General, Michael Law, Esq., Assistant Attorney General, Douglas Jurgens, Esq., Assistant Attorney General, for the defendant.

## MEMORANDUM

MOORE, District Judge.

A distinct odor emanates from the construction contract the Governor of the Virgin Islands, Charles Wesley Turnbull, signed with Global Resources Management, Inc. ["GRM"] on December 20, 2002, for emergency sewer repairs, and it is not the smell of sewage from the decrepit and failed St. Croix sewer system. It is the reek of politics and political influence, and quite possibly of political corruption. I have become all too familiar with the details of the St. Croix sewer system and this case and have observed the various players over the past several years. With this experience and background I am able to assess which of the various witnesses at the recent hearings on the GRM contract were telling me the whole truth. It is thus very clear to me that the Department of Public Works ["DPW"], including Commissioner Wayne Callwood and his negotiating team, tried to include contract terms that would keep control of the quality, scope, and cost of the work within DPW and not abandon that control to GRM. Unfortunately, DPW's efforts were no match for the corrupting political pressure from the Turnbull Administration through Ohanio Harris, Governor Turnbull's special assistant for St. Croix.

Between September 23, when Commissioner Callwood first attempted to forward the proposed contract with all the protective terms and attached specifications DPW could muster, and December 20, when the Governor signed the final document, the contract was stripped of DPW's attached specifications for the work, and had no firm deadlines for completion of the included projects, let alone an effective liquidated damages clause to enforce compliance with those vague deadlines. Significant new provisions were added during the contract's journey from DPW to the Governor that converted it into an open-ended contract in favor of GRM by providing for "allowance items" in excess of the "Contract Sum—$3,637,150.00" to be added by change order and limited only by "the maximum amount provided by law

and the availability of funds." Similar provisions had facilitated the massive cost overruns through change order by another of Ashley Andrews's companies in refurbishing the St. Croix Government House. Indeed, the proverbial smoking gun of this sorry saga is Exhibit 19, a memorandum to Governor Turnbull from GRM CEO, Ashley R. Andrews, Esq., dated September 30, 2002, after the DPW team had concluded its negotiations. The memorandum evidenced the commencement of a campaign for cost overruns through change order well before the contract was formally awarded to Andrews's assetless startup company, which had only applied for its license for business management and consulting six months earlier on March 4, 2002. (*See* Ex. 7.)

The red flag in the memorandum to the Governor is CEO Andrews's contention that the total contract price was more than double the $3,637,150 stated in the contract and "may be subject to equitable adjustment."

> *The parties agree that the actual cost of the referenced allowance items may exceed the costs contained herein. The Contract Sum may be adjusted by change order to reflect the difference between actual costs and the allowances. The allowances provided herein are contained in the total contract price of $7,929,912.*

(Ex. 19 (italics in original).) With the kind of political influence these proceedings have demonstrated Ashley Andrews and his business associates command within the Turnbull Administration, it is inconceivable that anyone in DPW, including the Commissioner, and surely not a DPW project manager in the field, would have been able to withstand the assault already underway to more than double the contract sum from $3,637,150 to $7,929,912.

## I. PROCEDURAL BACKGROUND

On December 20, 2002, Governor Turnbull signed a construction contract with Global Resources Management, Inc. for "Emergency Pipe Repairs, Replacement, Cleaning and Inspection at five locations on St. Croix, U.S. Virgin Islands." These projects for the St. Croix sewer system were among the repairs the United States and the Government of the Virgin Islands ["Government"] had agreed were critical in the Fall of 2001, and that the Government had then assured this Court would be completed, with one exception, by the middle of 2002. For providing all labor, materials and equipment, and upon satisfactory performance of the contract, the Government would have paid GRM at least $3,637,150 from the Corrective Action Trust Fund I had ordered to be established in a separate bank account. Although the contract provided in Paragraph 21 that it became effective upon the date of the governor's signature, no notice to proceed was ever issued by the Government's contracting officer, Marc Biggs, the Commissioner of Property and Procurement ["DPP"].

On January 23, 2003, the United States filed an Emergency Motion seeking an order requiring the Government to show cause why it should not be enjoined from proceeding with the GRM contract. That same day, I scheduled the show cause hearing for January 30, 2003. Two days before the hearing, Governor Turnbull terminated the GRM contract in the "best interest of the Virgin Islands." The next day, January 29, the Government moved to cancel the show cause hearing as unnecessary since the GRM contract had been terminated. Simultaneously, it moved to continue the hearing to the following week so that DPW's Senior Manager for Federal Programs, Sonya Nelthropp, could testify, and it also filed its response to the United States' motion. Because the provi-

sion of the GRM contract providing for termination for the convenience of the Government would allow GRM to seek compensation under the contract,[1] I ruled that it was still necessary to test the validity of the contract and denied the Government's motion to cancel the hearing. The hearing on the motion to show cause began on January 30 and continued on February 3, 2003, so that Ms. Nelthropp could testify.[2]

## II. THE CONSENT DECREE AND COURT–ORDERED REPAIRS

The United States filed this lawsuit against the Government of the Virgin Islands in March of 1984. In its complaint, the United States alleged that the Government was operating a number of its wastewater treatment plants ["WWTPs"] throughout the Virgin Islands in violation of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* and the Territorial Pollutant Discharge Elimination System ["TPDES"] permits issued for those WWTPs. In 1985, the United States and the Government of the Virgin Islands entered into a consent decree ["Original Decree"], pursuant to which the Government agreed to implement certain improvements to its wastewater system Territory-wide.

The Government failed to comply with many of the requirements of the Original Decree, setting a trend that continues to the present. In 1991, the United States moved to enforce the Original Decree and assess stipulated penalties for those many continuing violations. In 1996, the parties entered into an amended consent decree ["Amended Decree"] to resolve these dis-

putes, which included payment of a substantial monetary penalty. Under the Amended Decree, the Government agreed to construct two new WWTPs, to implement certain improvements to a number of its WWTPs and pump stations, and to meet certain effluent limits for its WWTPs. Although the Government has completed many of the projects required by the Amended Decree and has constructed two new WWTPs, it has consistently violated the effluent limitations set forth in the Amended Decree at a number of its WWTPs.

In February, 2000, the United States filed a motion requesting that the Court immediately order the Government to cease dumping raw sewage onto the soil of St. Croix and into the surrounding seas by its persistent pump station failures and broken sewer lines. Sadly, pump failures and sewer bypasses continue even as I write this Memorandum Opinion. The motion would also require repairs to the St. Croix WWTP, which was providing no treatment and dumping dangerously septic effluent into the Caribbean Sea through a broken ocean outfall pipe.

On February 12, 2000, I issued an order requiring the Government to repair the Figtree Pump Station, the LBJ Pump Station, and the Bethlehem Gut sewer interceptor by certain deadlines, and to restore the Anguilla WWTP to operation as soon as possible. On March 13, 2000, at the Government's request, I granted certain extensions to those deadlines. After hearings on April 25 and 26, 2000, I issued an order on April 28, 2000 finding that the

---

1. Addendum III to the GRM contract states that the contract may be terminated at the convenience of the government. The contractor has the right, however, to make claims for supplies, materials, equipment or services accepted by the government, costs incurred in the performance of the work terminated, and

the cost of settling and paying claims including legal fees.

2. Additional evidence bearing on the GRM contract surfaced at the periodic status conference on the Government's compliance with the Amended Consent Decree on February 13, 2003.

Government was not in compliance with several aspects of my February 12 and March 13 Orders. I found that there was still a bypass of raw sewage at the Figtree Pump Station, that the St. Croix WWTP was still virtually non-operational, and that the Bethlehem interceptor repair was not completed. I warned the Government that I would set new deadlines that would be "strictly enforced," and that the failure to comply with the revised deadlines would result in contempt hearings. On May 30, 2000, I issued an order with revised deadlines and again warned that contempt hearings would be held if the deadlines were not met.

On August 29, 2000, I personally inspected the LBJ and Figtree Pump Stations, the St. Croix WWTP at Anguilla, and a pipe collapse at Castle Burke before holding another hearing later that day. I observed that the Government had complied with some aspects of my prior orders. I also noted, however, that a bypass of sewage was again in progress at the Figtree Pump Station. In consultation with the Government and the United States, I set new revised deadlines. Following another hearing in October, I observed on December 13, 2000 that the wastewater situation had improved on St. Croix, cautioning however that

> this improvement may not be due to any institutional sense of urgency, but rather to the desire to avoid or delay the imposition of judicial sanctions. Even now, the St. Croix wastewater treatment system is only marginally functional and continues to teeter on the edge of collapse as a result of inadequate attention from successive government administrations.

After again consulting with the Government, I issued the revised deadlines the Government told me it could meet.

On September 27, 2001, I found that the Government had "allowed various St. Croix facilities once again to fall into a state of dismal disrepair and desuetude" despite the progress shown at the October 2000 hearing, and ordered the Government to show cause why it should not be held in contempt "for ·its continued and flagrant failure to comply with the Amended Consent Decree and this Court's orders."

Following the show cause hearing on October 18, 2001, and after again asking the Government to provide realistic time tables for these repairs, I issued an order on December 19, 2001, setting forth the "injunctive relief necessary to bring the Government into compliance with the Amended Decree, earlier Court orders, and the Clean Water Act." My order adopted the Government's completion projections and required DPW to finish the repairs and projects listed on Exhibit A to the order by specific deadlines, to provide an estimate of the costs of the repairs and projects, and to place the funds needed for the repairs in a separate bank account. Among the projects and repairs on Exhibit A were the investigation and/or repair of four broken sewer lines on St. Croix: (1) the open hole at Race Tack (located adjacent to the East Airport Road and the Randal "Doc" James Horse Race Track) by June 30, 2002; (2) the Bethlehem Gut sewer line by May 31, 2002; (3) the Catherine's Rest collapsed line segment by May 31, 2002; and (4) the Adventure Gut accumulation of raw sewage near the Patrick Sweeney Police Headquarters by August 31, 2002. The projects listed in Exhibit A also included obtaining a new emergency generator for the Lagoon Street Pump Station on St. Croix by August 30, 2002.

By motion dated May 31, 2002, the Government requested an extension of time to complete each of these projects: (1) Race Track repair—October 31, 2002; (2) Bethlehem Gut repair—October 31, 2002; (3)

Catherine's Rest repair—September 20, 2002 (evaluation by July 31, 2002); and (4) Adventure Gut repair—October 31, 2002. By order dated June 10, 2002, the Court granted the extensions requested by the Government.

At a hearing on June 26, 2002, the Government requested yet additional extensions as follows: (1) Bethlehem Gut—December 30, 2002; (2) Catherine's Rest—December 30, 2002; (3) Adventure Gut—December 30, 2002; and (4) Lagoon Street—February 28, 2003.[3] The United States agreed to these further extensions and I incorporated them in my order of August 12, 2002.

On November 8, 2002, the Government filed a motion seeking further extensions of certain of the deadlines for the Exhibit A projects, including an extension for the repair at Race Track to December 30, 2002. The United States did not oppose the motion and I granted this extension by order issued November 19, 2002, as follows: (1) Race Track—December 30, 2002, (2) Bethlehem Gut—December 30, 2002; (3) Catherine's Rest—December 30, 2002; (4) Adventure Gut—December 30, 2002, and (5) Lagoon Street (emergency generator and discharge pipe)—February 28, 2003.

At no time did the Government seek further extension of these deadlines, even though my December 19, 2001 order provided that the Government must file motions for extensions of time "well before the scheduled deadline." The Government has presented no credible evidence of any difficulties in contracting for the court-ordered St. Croix sewer-line repairs from December 2001 to October 2002 that necessitated the extensions of the mid–2002

deadlines to December 30, 2002. Most disturbing to me is the paucity of evidence that the Government was even halfheartedly trying to get these sewer lines repaired. After all, tens of thousands of gallons of sewage have been flowing from Bethlehem Gut every day for two years and the hole at Race Track has been open for some seven years. I can only conclude that the Government's unconscionable failure to meet any of these deadlines is a direct result of the Turnbull Administration corruptly steering these projects to GRM and Ashley Andrews.

## III.  FINDINGS OF FACT

### A.  Conflict of Interest and Political Influence—Ohanio Harris

1. Ohanio Harris was and still is the Special Assistant to the Governor for St. Croix. His duties include serving as liaison between the Governor and DPP for contracts, especially those for the island of St. Croix. (Biggs Transcript ["Tr."], Jan. 30, 2003, at 69, 138; Nelthropp Tr., Feb. 3, 2003, at 77.)

2. On October 17, 2001, the day before the hearing in which it was confirmed that a separate bank account would be set up, Harris summoned DPW Commissioner Callwood to Government House on St. Croix to meet with Ashley Andrews and Berger Engineering, a well-known Boston construction company, about a contract to repair the St. Croix waste water system. Harris and Andrews led Callwood to believe that Andrews would be joint venturing with Berger. Callwood was relieved and optimistic that with Berger, "we get a serious company on the island of St. Croix to do the work." (Callwood Tr. at 49.) No

---

**3.** In issuing the Order of August 12, 2002, I adopted the revised schedule as proposed by the Government, which deviated from the original December 19, 2001 Exhibit A in two respects. First, the accumulation of raw sewage at Adventure Gut had already been cleaned up so the order only called for the investigation of the problem. Second, the order added repair of sewer lines at Lagoon Street.

joint venture with Berger Engineering can be found in the GRM contract signed by the Governor. (Ex. 5.) During the meeting, Harris indicated that it was about time that St. Croix got "a piece of the action," (Callwood Tr. at 46), although neither he nor Andrews mentioned GRM at the time, (*id.*), and Harris never told Callwood of his business relationship with Andrews and GRM, (*id.* at 48).

3. Neither Callwood nor Biggs knew that Harris had ever been president of or affiliated with GRM. Harris never revealed to Callwood during all the meetings in which he was pressuring DPW and DPP to award the contract to GRM that he had been the President of GRM until March 8, 2002. (*Id.* at 46–49; Def.'s Revised Proposed Findings at 7, ¶ 13.) Biggs testified that disclosure of this fact would have caused him concern. (Biggs Tr. at 116–18.) Callwood said that, "[i]f he had told me that, definitely I would have told him, no can do." (Callwood Tr. at 59.)

4. Attorney General Stridiron has agreed that Harris acted improperly "in that he should have, at a minimum, informed VI Government officials of his earlier relationship with the Contractor," but that this impropriety should have no effect on the validity of the contract. (Def.'s Revised Proposed Findings at 8, ¶ 18.) Contrary to what the Attorney General would have me find, the fact that "the Contract was not even signed by the Governor until December 20, 2002 and not released until its termination on January 28, 2003," (*id.* ¶ 19), does not rebut in any way the evidence that Harris's political pressure on government officials corrupted the procurement process of the Government of the Virgin Islands by causing the contract to be awarded to GRM.

5. Even though Callwood was reluctant on the witness stand at the January 30, 2003 hearing to acknowledge the pressure from Harris or his concerns about Andrews, he did concede that Sonya Nelthropp expressed reservations about the contract with GRM. (Callwood Tr. at 51–53.) The United States filled in the gaps caused by Callwood's reluctance via the testimony of Nicholas Peru, investigator for the Virgin Islands Office of the Inspector General. Peru testified that Callwood had complained to him in an interview just two weeks earlier that Ohanio Harris and Ashley Andrews had called him many times while the GRM contract was pending. Callwood related that he advised Harris that Ashley Andrews "sues over everything," but Harris's mind was set. Callwood also told Peru that Andrews "must have backing" because he "got contract after contract," and that when "Ashley Andrews is involved the price doubles or triples." (Peru Tr. at 181–82.) The validity of Callwood's concern was corroborated by Commissioner Biggs's testimony that, years earlier, Ashley Andrews had received substantial payment for work that was never performed under the Rogge project. (Biggs Tr. at 82–83.)[4]

6. Evidencing confidence in his political clout within the Turnbull Administration, Andrews refused to give Nelthropp the list of subcontractors GRM would be using until after the Governor signed the contract and DPP issued the notice to proceed. (Nelthropp Tr. at 112–15.)

---

**4.** *See also General Eng'g Corp. v. Virgin Islands WAPA,* 21 V.I. 436, 444, 458, 636 F.Supp. 22, 27, 36 (D.Vi.1985) (describing Ashley Andrews as "a lawyer ... [who] has ready access to the governor [Juan Luis] at Government House or at home. He is adroit at bringing private businesses together with the Virgin Islands government for various projects" and is "highly experienced at guiding business proposals through high level government circles."), *aff'd* 805 F.2d 88 (3d Cir. 1986).

7. Evidence of this political influence continued through the hearings. For example, Attorney General Stridiron would have me "candidly" find that this matter came before the Court "because of one principal reason, the involvement of Ashley Andrews." (Def.'s Revised Proposed Findings ¶ 15.) The Attorney General would even have me conclude this opinion with a statement that is wholly unsupported by the evidence. Incredibly, Attorney General Stridiron would have this Court "suggest that for the good of the residents of this Community, that the VI Government consider vacating its termination of the Contract or renegotiating its terms in order to have the repairs completed as expeditiously as possible without further delays associated with finding another Contractor." (Id. ¶ 16.) The evidence is overwhelmingly to the contrary, namely, that the award of this contract to Ashley Andrews and GRM is yet another example of elected and appointed officials of the Virgin Islands Government putting crass politics ahead of fiscal responsibility, not to mention their abject failure to protect the health and safety of the people of the Virgin Islands.

## B. The Contract

8. Based on the evidence before me, the next step on the road to awarding the GRM contract was an unsolicited proposal to DPW sometime in August 2002, even before GRM obtained its engineering license on September 4, 2002. Due to the Government's abysmal history of not paying its bills, it was virtually unheard of for a company to come to DPW with such an unsolicited proposal. (Nelthropp Tr. at 45–46.) The difference here, of course, is that this Court had insisted that more than $16,000,000 be set aside in a separate bank account to fund these specific critical repairs.

9. Sonya Nelthropp, Senior Manager for Federal Programs, had been tasked by Commissioner Callwood with handling all the consent decree waste water projects. She learned of the unsolicited proposal when she returned in August 2002 from medical leave. Nelthropp felt that GRM's main asset was Esdel Hansen, who had been the director of utilities for DPW on St. Croix for many years until he retired in 2000. He knew where the sewer lines were located and had experience with some of the issues with the lines. "So he was really the key to our looking at that company as somebody to provide us with the services that we needed." (Id. at 72.) At some point, Nelthropp met with Andrews and Hansen, who told her that they "were putting together a proposal with respect to the consent order projects, and that they would present us with their findings, that they had engaged Berger Engineering and Antillean to work with them on developing the scopes as they saw for the lines for those particular projects." (Id. at 74.)

10. Nelthropp handed the unsolicited proposal, which had no estimates of cost, to DPW engineer Charles Bornman from the St. Thomas office, "sometime in late August. And she asked [him] to sit in for her in meeting on St. Croix with the principals of [GRM]." (Bornman Tr., Feb. 3, 2003, at 152.) Bornman took Alex Bruney, a DPW project engineer from St. Thomas, with him one morning to St. Croix to meet with Joe Bradford, the DPW Chief of Utilities for St. Croix, to go over the GRM proposed scopes of work to see if all that work needed to be done and to come up with price estimates. GRM's unsolicited proposal was for eleven projects, including four which Bornman and Bradford agreed were unnecessary and were not listed on the Court's Exhibit A. (Id. at 154–55.) When they met later that day, Bornman advised Andrews and Esdel Hansen that these four projects would be excluded from the negotiations. Bradford still believed

that GRM's scopes of work for the remaining seven projects called for more than needed to be done.[5]

11. Because he was getting a difference of opinion on how much work needed to be done, Bornman drafted two contracts, one with a scope of work for the seven projects in Exhibit A as proposed in GRM's unsolicited proposal and one for Joe Bradford's scope of work for those projects. He presented them to Nelthropp with a memorandum on September 10, 2002, reciting an estimate of $2.833 million for GRM's proposal and an estimated $1.28 million for Bradford's scope of work. (Ex. 21.) Reflecting the universal concern among the negotiating team that DPW and not GRM control the work under the contract, Bornman reported that he "prepared contracts for the original Global scope with language allowing the Department of Public Works Project Manager the authority to limit the work upon field verification." He accordingly was willing to write a contract for the GRM scope, "provided we had the language allowing us to scale back the work as necessary. This may need to be expanded if the language I included doesn't seem protective enough." (*Id.*)

12. After discussing the concerns in his memorandum with Nelthropp, Bornman went back to St. Croix and met again with Andrews and Hansen, as well GRM's newly hired field coordinator, Vincent Kelley. Bornman was also introduced to Justin Berkley, of Antillean Engineers, who acted as GRM's engineer and with whom Bornman thereafter negotiated on prices and scope and actual line items. (Bornman Tr. at 157–58.) After negotiating, Bornman was willing to support a contract for the GRM scope of work at a price of $3,637,150, "but … I said we have to have language that gives the project manager

the authority to limit the work upon field verification." (*Id.* at 163.)

13. As Bornman reported to Nelthropp in the memorandum of September 23, 2002, forwarding the proposed contract, it was "for the original Global scope with language allowing the Department of Public Works Project Manager the authority to limit the work upon field verification …." (Ex. I.) Bornman was skeptical that GRM would be able to do the work simultaneously at multiple locations, being aware that GRM did not have any construction experience. (Bornman Tr. at 185, 194.) He nevertheless gained comfort from the standard protective clauses of liquidated damages, compliance with safety issues, trench construction, OSHA, and the like that he insisted be included, as well as a provision incorporating and attaching the specifications for each phase of the work he drafted to assure that GRM would conform to the contract provisions. Bornman forwarded to Nelthropp "a copy of the construction contract, scope of work, compensation language and specifications for Global Resources Management, Inc. to perform pipe repair services on St Croix." (Ex. I.) These specifications for each aspect of the work were included as Attachment III to the proposed contract and were "part and parcel of the contract that the contractor was required to abide by." (*Id.* at 159–60.) Bornman had no explanation why these protective provisions, including his detailed specifications and specific time requirements for completion were not included the final contract. (Bornman Tr. at 160; Ex. 5.) It has become all too clear why these protective provisions were excluded from the final contract signed by the Governor.

14. On September 23, 2002, the same day she received Bornman's memo with

---

5. On September 3, 2002, Andrews sent Nelthropp an email attaching the "Scope–of–Work as prepared by our staff." (*See* Ex. 22 (without attachment).)

attachments, Nelthropp drafted a letter for Commissioner Callwood forwarding Bornman's draft contract with hard copies and floppy disks of the compensation terms, and his attachments, including Attachment III—the specifications—to DPP Commissioner Biggs. (Ex. 4.) Commissioner Biggs testified that the letter was insufficient to justify the award of the contract to GRM. (Biggs Tr. at 74–76.) Biggs sent the original letter to his Deputy Commissioner of Procurement, Olga Meyers, on September 27, 2002, with a note asking her to "ensure the following from DPW: (1) need for services; (2) why no competition was sought; (3) consent decree; and (4) was anyone else considered." (Ex. 8c, Mem. from Olga Meyers, DPP, to Marc Biggs, Comm'r, dated Jan. 21, 2003.)

15. Exhibit 20, a DPW file produced by Bornman, contained a facsimile of part of a page of a memorandum Ashley Andrews sent to the Governor on September 30, 2002 (the memorandum is Exhibit 19; the one-page fax is not separately marked as an exhibit). CEO Andrews faxed this page to Bornman on October 1, 2002, with a handwritten note "To: Mr. Charles Bornman, From: Ashley Andrews, Re: Emergency Repairs." The printed part of the facsimile includes the statement,

> The parties agree that the actual cost of the referenced allowance items may exceed the costs contained herein. The Contract Sum may be adjusted by change order to reflect the difference between actual costs and the allowances. The allowances provided herein are contained in the total contract price of $7,929,912.

6. See, e.g., Marty Schladen and Billy Shields, *Andrews was Involved in Numerous Controversial Deals*, Virgin Islands Daily News, Jan. 30, 2003, *available at* http://www.virginislandsdailynews.com/index.pl/article?id=939992 (reporting interview with Ashley Andrews).

● This contract falls within the uncertainties mentioned in the Government House contract in view of the fact that the Government (i.e., Public Works) could not provide

next to which Andrews had written "$3,637,150." (Ex. 20, Unmarked Fax (italics in original, rest of printed memo is cut off).) A hand-written edit by Andrews replaced the word "did" with "could" in the last line. (Cf.Ex. 19.) Testifying during the status hearing on February 13, 2003, Bornman recognized this as an attempt by Andrews to incorporate in the GRM contract the same kind of change order provision that Andrews had successfully included in the contract of another of his companies, C & C/Manhattan, for refurbishing Government House on St. Croix, a project notorious for its change orders and massive cost overruns.[6] Bornman did not see the entire memorandum marked as Exhibit 19 until some time in October after he got back from a trip to California. Because they had completed negotiations as far as Bornman was concerned, the memorandum did not make sense to him and he paid no attention to it. It appears that Bornman was out of the loop regarding Andrews's political influence.

16. In his September 30 memorandum to the Governor, CEO Andrews recited that GRM "has prepared both a construction estimate and an engineering estimate for all seven (7) projects" and requests that the commissioners of DPP and DPW, the chief engineer and Charles Bornman [misspelled "Bowman"] of DPW meet with the "constructor" on St. Croix "to review and to establish quantities of work for the various projects; agree to units of measure; and establish unit prices as allowances for each of the projects." (Ex. 19.)[7]

7. Ashley Andrews even presumed to tell the Governor which DPW official should deal with him and GRM:

With all due respect to Bornnman [sic] and Ms. Nelthropp, it is my understanding that the Government's engineer is Edwardo de

Attached to Andrews's memorandum to the Governor was a two page "AGENDA, Saturday September 28, 2002, Concerns of Contract for Completing Emergency Repairs, St. Croix—Court Order."

17. The second item on Andrews's agenda is

II. Addendum V—Government House (*"Exhibit C"*):

States the following in Paragraphs 2 & 3 thereof—*The parties recognize the uncertainty with respect to certain items in the scope of work for the project and believe that the interests of the project will be best served by providing allowance items as to certain portions of the work. The parties acknowledge the allowances contained herein may be subject to equitable adjustment.*

*The parties agree that the actual cost of the referenced allowance items may exceed the costs contained herein. The Contract Sum may be adjusted by change order to reflect the difference between actual costs and the allowances. The allowances provided herein are contained in the total contract price of $7,929,912.00.*

● This contract falls within the uncertainties mentioned in the Government House contract in view of the fact that the Government (i.e., Public Works) did not provide us with maps, surveys, and scope of the various projects number 200 through 1100. As a result our engineer had to make certain guesstimates [regarding the depth of the pipes, the width of the excavation, the width of the trench backfill and com-

paction, and the cost of removing and disposing of what was removed] ....

(*Id.* (italics in original).) Andrews's fax to Bornman on October 1, 2002 came from this part of his memorandum. CEO Andrews ends the Agenda with:

● It is clear therefore that without drawings, maps, surveys, etc., one cannot expect a subcontractor to be held firmly to a figure, which results from a guesstimate; however, we have sufficient information today such that allowance items could be created for each of the projects except the Southwest Interceptor.

In conclusion, Andrews recommended "that we use the figure of $3,637,150.00 as an allowance figure and amend this figure by change orders to reflect the true cost of the project. The obvious advantage to this is that neither party is disadvantaged."

18. Confirming his political clout within the Turnbull Administration, Andrews's memorandum to the Governor prompted a meeting on Friday, October 4, 2002, at the Attorney General's office on St. Croix, attended by Attorney General Iver Stridiron and Assistant Attorney General Michael Law, Herbert Grigg from DPP, Ohanio Harris, and Ashley Andrews. (Ex. 8a, Mem. from Herbert A.E. Grigg, Jr., Chief Operating Officer, DPP, to Randolph Latimer, Acting Comm'r, dated Oct. 4, 2002.) The absence of the Commissioners of DPW and DPP at the meeting reportedly upset the Attorney General. (*Id.*)

I find it significant that nobody from DPW who knew anything about the proposed scope of the work and what actually needed to be done attended this Friday

O'Neal and I think that he should be an integral part of this exercise. I am told that only he could sign off for the Department on matters of this nature. (Ex. 19.) Because neither I nor the Court Monitor could recall this name ever coming

up in all my dealings with DPW in the case or in any of the many hearings, the Court Monitor inquired and was advised that Mr. O'Neal is the Deputy Commissioner for Public Works for Engineering.

meeting on St. Croix or the second meeting the following Monday on St. Thomas.

CEO Andrews "informed the group that he came prepared to sign the contract between the Department of Public Works and Global Resources Management Inc. today." (*Id.*) No one at the Friday meeting had the attachments, as they were with Deputy DPP Commissioner Meyers on St. Thomas. She attended by telephone and "was able to provide pertinent information on the contract draft she had before here [sic], the addendums, *and deletions made.*" (*Id.* (emphasis added).) Meyers "informed the A.G. that the document in my possession was incorrect and needed corrections and additional information from DPW." (Ex. 8c, Mem. from Olga Meyers, DPP, to Marc Biggs, Comm'r, dated Jan. 21, 2003.) A second meeting was scheduled for the following Monday at DPP on St. Thomas "to review the contract, review and discuss Attorney Law's points, and *proceed as per the Governor's mandate* .... The Attorney General indicated that the contract will get done, however we have to make sure that it is done the right way. As such, he said that Attorney Law will be at Monday's meeting." (Ex. 8a (emphasis added).)

19. Again, none of the DPW negotiating team members—not Nelthropp or Bornman from St. Thomas, nor Bradford from St. Croix—attended the second meeting on Monday at the St. Thomas DPP office. Commissioner Callwood was there, as well as Olga Meyers in person, Assistant Attorney General Michael Law, Ashley Andrews, and, of course, "Ohanio Harris, Gov. Office." (Ex. 8b, DPP Attendance Roster, 10:00 A.M., Oct. 7, 2002.) They reached Bornman in California by telephone and clarified the quantities of pipe needed and "the payment process agreed upon by DPW and GRM relative to the actual pipes installed." (Ex. 8c.) Andrews "was dismissed from the meeting after clarification on issues that dealt with the actual scope of work. This allowed the representatives from the various departments to express whatever concerns they had," (*id.*), with Governor Turnbull's assistant, Ohanio Harris, remaining to listen and, as necessary, even report back to his business associate.

20. As one of the results of these meetings with Ashley Andrews, Ohanio Harris, the Attorney General and one of his assistants, and DPP representatives, Commissioner Callwood revised his cover letter of September 23, 2002, to Biggs. (Separately marked as Ex. 2, and included with contract in Ex. 5.) The revised letter added that one other contractor had been contacted and the statement that "GRM also demonstrated that they had the resources both in engineering and construction to complete the required tasks within the deadlines specified by the court order," (Ex. 2), even though Callwood knew that GRM did not have any construction experience, (Callwood Tr. at 36–37).

21. Another result of these early October meetings with Ashley Andrews and Ohanio Harris was the preparation of the actual construction contract with GRM. Deputy Commissioner Meyers reported to Commissioner Biggs:

> Based on the discussions held and the submission of the documents from the Department of Public Works, a construction contract was prepared for Global Resource Management to provide Emergency Pipe Repair, Replacement, Cleaning and Inspection at five locations on the island of St. Croix based on the Emergency Proclamation issued by the Honorable Governor Charles W. Turnbull.

(Ex. 8c at 2.) As Commissioner Biggs was out sick, Acting Commissioner Latimer forwarded a letter to the Attorney General on October 11, 2002, "requesting review

and approval of the proposed contract."

The same day, Attorney General Stridiron forwarded a letter addressed to Commissioner Marc Biggs with salutations to Governor Turnbull transmitting the proposed contract for approval. The contract was reviewed and approved for legal sufficiency with a recommendation for approval. Based on the review and approval, the proposed contract was forwarded to the Governor through Atty. General Iver Stridiron.

(*Id.*) The result of all this is Exhibit 5, the GRM contract signed by Governor Turnbull on December 20, 2002.

22. Attorney General Stridiron would have me find that Andrews's memorandum to the Governor was merely his way of communicating his annoyance with the Public Works negotiators, but that "there is no evidence that the Governor intervened and the contract remained a $3,637,150 contract." A look at the language of the final GRM contract confirms that the Attorney General's suggestion lacks credibility. For example, Addendum V of the contract the Governor signed, it contains Andrews's second paragraph word-for-word (except for an obvious misspelling). Andrews's Paragraph 2:

*The parties recognize the uncertainty with respect to certain items in the scope of work for the project and believe that the interests of the project will be best served by providing allowance items as to certain portions of the work. The parties acknowledge the allowances contained herein may be subject to equitable adjustment.*

Signed Contract Paragraph 2:

The parties reorganized [sic] the uncertainty with respect to certain items in the scope of work for the projects and believe that the interests of the project will be best served by providing allowance items as to certain portions of the work. The parties acknowledge the allowances contained herein may be subject to equitable adjustment.

Addendum V also incorporated the essence of Andrews's third paragraph, except that the contract revisors substituted an open-ended provision, "subject to the maximum amount provided by law and the availability of funds," for Andrews's cap of $7,929,912 on the total contract price. Andrews's Paragraph 3:

*The parties agree that the actual cost of the referenced allowance items may exceed the costs contained herein. The Contract Sum may be adjusted by change order to reflect the difference between actual costs and the allowances. The allowances provided herein are contained in the total contract price of $7,929,912.00.*

Signed Contract Paragraph 3:

The parties agree that the actual cost of the allowance items may exceed the costs of the Contract Sum— $3,637,150.00. The Contact Sum may be adjusted by *change order* to reflect the difference between actual costs and the allowances, subject to the maximum amount provided by law and the availability of funds.

(Ex. 19 (italics in original); Ex. 5 (underscore in original).)

23. Evidence of the political influence of Andrews and his associates continued with Attorney General Stridiron's letter of November 26, 2002 urging the Governor to sign the GRM contract to accommodate GRM's efforts to secure a bond: "I understand that the Contractor has attempted to secure a bond but maintains that it is unable to secure a bond until it presents a copy of a fully executed Contract to the bonding company." (Ex. 16.) Noting that the Court had ordered the St. Croix sewer lines to be repaired by December 31, 2002, Attorney General Stridiron advised: "I now recommend that you execute the Contract and provide a *copy* to the Contractor.

Nevertheless, you should withhold transmitting the executed Contract to Property and Procurement until the Contractor obtains a bond." (*Id.* (underscore in original).) A copy of this letter was also sent to DPP Commissioner Biggs.

24. Commissioner Biggs never saw the executed contract with GRM until after the United States Attorney challenged its validity, when the Governor instructed Biggs on January 28, 2003 to terminate the contract. (Biggs Tr. at 95–96; Def.'s Mot. To Cancel Show Cause Hr'g, Ex. 1; *see* Ex. 6.) According to Commissioner Biggs, GRM could still claim and sue for certain payments after its termination. (Biggs Tr. at 98–101.) The provisions of Addendum III to the contract governing termination for convenience of the Government would give GRM the right to make claims for completed supplies, materials, equipment or services accepted by the government, costs incurred in the performance of the work terminated, and the cost of settling and paying claims, including legal fees. (Ex. 5.)

25. GRM's claim under Addendum III would have been sure to follow inasmuch as Andrews had already claimed in his September 30 memorandum to the Governor that GRM was entitled to be paid for the services it had to provide in creating the estimated scope of work because the "Government has failed to provide maps, surveys, engineering designs, topographic surveys, and manhole and pipe replacement systems." (Ex. 19.) Asserting that GRM had provided these services "in reliance upon the representations and assurances of Sonya Nelthropp of Public Works," CEO Andrews had requested "immediate negotiations for a professional services contract, which will enable GRM to pay the above-named persons for their past, present, and future services." (*Id.*) Concerned to make sure he would not have to rely on the general fund for payment, Andrews again presumed to instruct the Governor: "It should be understood that this professional services contract should be paid from the 'Locked Box Sums' in order to expedite payment of mobilization and other costs." (*Id.*) As Biggs testified, the Government would have no obligation to pay for such a claim because work cannot legally be done under a construction contract until the Commissioner of DPP has given the contractor a notice to proceed. (Tr. Biggs.) Given Andrews's demonstrated political influence, however, there could be no assurance that the Turnbull Administration would have had the backbone to reject such a specious claim for services gratuitously provided by Ashley Andrews and GRM.

## C. The St. Croix Sewer "Emergency"

26. On October 9, 2001, before this Court's hearing on October 18, 2001, to show cause why he and other members of his administration should not be held in contempt of court for failing to protect the people from the raw sewage running in the streets of St. Croix, Governor Turnbull declared a "state of emergency" under 31 V.I.C. § 239(a)(1). This "Emergency Proclamation" purported to allow DPW to disregard the usual competitive bidding requirements contained in 31 V.I.C. § 236.[8] The Attorney General would have

---

8. Governor Turnbull has signed several proclamations regarding wastewater in the Virgin Islands. (Ex. C.) The first was dated October 9, 2001, and proclaimed a "state of emergency" for 90 days, waiving Title 31 V.I.C. § 236 and stating that contracts for repair of the sewer system will be clearly stamped "PUBLIC EXIGENCY". The second proclamation was dated March 27, 2002, and appears to be identical to the initial proclamation, except that it ran for 120 days. The third proclamation was dated September 20, 2002, and is identical to the other two, except that it purported to fill the gap from July 27, 2002, when the second proclamation lapsed and run for another 120 days. The final procla-

me characterize these competitive bidding provisions as the "well known cumbersome competitive bidding requirements." I will not so characterize these procedures because I agree that the

> [c]ompetitive bidding laws originated in distrust of public officers whose duty it was to execute public contracts. The laws are designed to prevent fraud, collusion, favoritism and improvidence in the administration of public business . . . . .
>
> The open competition fostered by competitive bidding serves two recognized purposes. First and primarily, it protects the taxpayer or ratepayer by assuring efficient use of public revenues. Competitive bidding also serves to provide a fair forum for those interested in undertaking public projects.

*See General Eng'g Corp. v. Virgin Islands WAPA*, 21 V.I. 436, 464, 636 F.Supp. 22, 40 (D.Vi.1985) (citations omitted).[9] These are the very same concerns raised by the Government's conduct in awarding this contract to GRM.

27. At the October 2001 contempt hearing, Commissioner Callwood agreed that the Government would continue to review the qualifications of contractors and provide for proper bid procedures. (Ex. 1, Tr. of Hr'g, Oct. 18, 2001, at 25–7.) He also testified that he was aware of the Governor's Emergency Proclamation on wastewater issues that "allows us to circumvent certain bidding, procurement requirements, to facilitate getting contracts out on the street a lot quicker, to hire contractors a lot quicker." (*Id.* at 46–47.) When asked whether this would result in bypassing the bidding requirements, Callwood assured the Court:

It is not bypassing. You wouldn't have to—it's an expeditious way of getting contracts out. It would not bypass the procurement procedure but everything would be expedited a whole lot quicker. Public exigency is basically what it would be. When we extend a contract to Property and Procurement, it takes priority over everything, basically every single thing, and to [the Virgin Islands Department of] Justice. So it would not be lingering on anyone's desk. It goes directly to the Commissioner. He reviews it, signs off.

(*Id.* at 47.)

28. Commissioner Biggs testified that if Property & Procurement had handled this contract from the outset, it would have required three firms to give quotes. In a letter admitted as Defendant's Exhibit B, however, the Attorney General opined that any contract awarded under the Governor's Emergency Proclamation, 31 V.I.C. § 239(a)(1), "permits the procurement of goods and services without any competition when the Governor declares, by emergency proclamation, that such goods and services may be obtained without competition." Attorney General Stridiron described the role of Property & Procurement as merely to "process and approve the contracts as expeditiously as possible." (Ex. B.)

29. Commissioner Biggs testified that in the normal process of bidding a construction contract, the Government would prepare the engineer's estimate, also known as the scope of work, and solicit construction contractors to submit their bids and construction estimates. (Biggs Tr. at 104–05.) Biggs also testified that the competitive bidding process to award the construction contract for these court-

---

mation, dated November 25, 2002, appears to be identical to the other three and ran for 120 days.

**9.** Ashley Andrews is intimately familiar with this case, having been named as a defendant charged with conduct very similar to his conduct here.

ordered repairs, including the "cumbersome" bidding and advertising procedures, if expedited, could have taken DPP as little forty-five days to complete. (*Id.* at 107–08.) This is what the people of St. Croix and the Virgin Islands had every reason to expect would happen when Governor Turnbull told me at the contempt hearing he would be doing "some micromanaging" to make sure that these critical repairs would be carried through "because the Virgin Islands is our nest. And if we violate our nest, then we cannot survive."

30. The Attorney General would also have me find that the decision of the Governor to eliminate competitive bidding for these court-ordered St. Croix sewer repairs was an exercise of the Governor's statutory authority to declare emergencies because "there was a continuing emergency with regard to the wastewater system." (Def.'s Revised Proposed Findings at 6, ¶ 7.) This I cannot do because the continuing crisis in St. Croix's waste water treatment system does not meet the statutory definition of "emergency," as clarified below. Moreover, it is clear that the normal process of bids or requests for proposal would have produced a contract in a much shorter time that these so-called emergency procedures the Turnbull Administration used to steer the contract to GRM. (Biggs Tr. at 106–08.)

31. On January 29, 2003—during the pendency of this proceeding—the Government compiled a report outlining the progress on various court-ordered waste water repair projects in the Virgin Islands. Other than cleaning the manholes at Adventure Gut, none of the repairs to the sewers in St. Croix that were ordered by the Court in December 2001 have been performed. (Ex. E.)

32. Bornman testified that on January 28, 2003, he gave the pertinent scopes of work and pertinent specifications for the projects covered by the GRM contract to Island Roads and asked them to prepare a "one-day turnaround" quote for that work. Island Roads responded the next day with a proposed price of $3.474 million. (Bornman Tr. at 198, 203.) Thus, in a relatively short time, DPW could have gotten a bid from a qualified and bondable Virgin Islands contractor, with equipment and experience, to perform the work for less money than GRM. During his testimony at the compliance status conference on February 23, Joe Bradford confirmed that he had worked with three or four qualified contractors on St. Croix who are capable of handling these sewer-line repair projects. In addition, another local contractor DPW already has under contract to build enclosures for the replacement emergency generators at LBJ and Figtree pump stations could do the same for the Lagoon Street.

## IV. JURISDICTION AND INJUNCTIVE RELIEF

This Court has jurisdiction over this action filed by the United States in 1984 pursuant to section 309(b) of the Clean Water Act ["CWA"], 33 U.S.C. § 1319(b), which authorizes the United States to file civil actions for violations of the CWA in the district court where the defendant resides and expressly authorizes the Court to grant injunctive relief. Jurisdiction over the action is also grounded in 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1345 (United States as plaintiff), and section 22(a) of the Revised Organic Act of 1954.[10]

---

**10.** 48 U.S.C. § 1612(a). The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541–1645 (1995 & Supp.2001), *reprinted in* V.I. Code Ann. 73–177, Historical Documents, Organic Acts, and U.S. Constitution (1995 & Supp.2001) (preceding V.I. Code Ann. tit. 1).

This Court unquestionably has the authority to invalidate the GRM contract and enjoin the parties from performing the contract. The Virgin Islands Government entered into the GRM contract to implement certain repair projects required by this Court's December 19, 2001 Order, as amended. The evidence is overwhelming that the GRM contract would likely frustrate compliance and promote further noncompliance with that court order and the Amended Decree, both because the contract was entered into in violation of Virgin Islands law and because GRM lacks the experience and wherewithal to perform the scope of work covered by the contract. A district court has a broad range of equitable powers to enforce and effectuate its orders and judgments. *See Holland v. N.J. Dept. of Corrections*, 246 F.3d 267, 270 (3d Cir.2001) ("it is settled that a court does have inherent power to enforce a consent decree in response to a party's non-compliance, and to modify a decree in response to changed conditions") (citing *Spallone v. United States*, 493 U.S. 265, 276, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990) (stating that courts have inherent power to enforce compliance with their consent decrees)); *see also United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 248, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968) (noting that courts have inherent power to modify a consent decree upon an appropriate showing).

The court may enter a permanent injunction under section 309(b) of the CWA only " 'after a showing of both irreparable injury and inadequacy of legal remedies, and a balancing of competing claims of injury and the public interest.' " *See Public Interest Research Group of N.J. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 82 (3d Cir.1990) (quoting *Natural Resources Def. Council, Inc. v. Texaco Refining & Mktg., Inc.*, 906 F.2d 934, 941 (3d Cir.1990)). Here, injunctive relief is clearly appropriate. The discharge of raw sewage from broken sewer lines is a violation of the CWA as well as the Amended Decree and this Court's several orders, including the December 19, 2001 Order, as amended, which required these sewer line repairs to be completed by December 30, 2002. Thus, the United States has proved its case on the merits.

Irreparable harm obviously is present where broken sewer lines cause raw sewage repeatedly to be discharged into the environment. Such environmental harm and imminent risk to human health can only be viewed as irreparable. *See Natural Resources Def. Council*, 906 F.2d at 941 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 at 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)). Finally, in view of the serious risk posed to the public health and the environment by these broken sewer lines, the balance of the equities, as well as consideration of the public interest, clearly call for injunctive relief.

## V. THE GRM CONTRACT WAS ISSUED IN VIOLATION OF VIRGIN ISLANDS PROCUREMENT LAW BECAUSE THERE WAS NO EMERGENCY TO JUSTIFY THE GOVERNOR'S EMERGENCY PROCLAMATION

The Government has castigated the United States for questioning the quality of the contracting process and the existence of an "emergency" to justify circumventing the competitive bidding process. In somewhat similar and maybe even more critical circumstances, this Court has noted that St. Croix's "desperate" problem with power generation was not an "emergency" as that term is defined in the Virgin Islands code. *See General Eng'g Corp.*, 21 V.I. at 472–73, 636 F.Supp. at 45–46.

As noted, the general rule of statutory construction is that statutory language should be accorded its ordinary mean-

ing. Black's Law Dictionary 469 (rev. 5th ed.1979) defines "emergency" as

A sudden unexpected happening; an unforeseen occurrence or condition; perplexing contingency or complication of circumstances; a sudden or unexpected occasion for action; exigency; pressing necessity. Emergency is an unforeseen combination of circumstances that calls for immediate action.

In view of the fact that the WAPA board was cognizant of the need for a new generating facility since 1984 it cannot fairly be said that the May 23 contract was prompted by an unforeseen combination of circumstances. Thus, the emergency exception does not apply in this case.

*Id.* at 472, 636 F.Supp. at 45 (holding that there was no requirement of competitive bidding in this case because the contract was for professional services).

The Territorial Court has defined an emergency under Virgin Islands law as "a sudden or unexpected necessity requiring speedy action." *C&C/Manhattan v. Government of Virgin Islands,* Civ. No.1998–876, 1999 WL 117765 *6, n. 17 (St. Croix Div. Feb. 12, 1999), *dismissed as moot,* Civ.App. No.1999/038, 2000 WL 1673356 (St. Croix Div. Sept. 29, 2000) (holding that C & C/Manhattan had no standing as a disappointed bidder to challenge the award of the construction contract for the prison on St. Croix). The Territorial Court judge noted that prison overcrowding existing for well over ten years did not constitute an emergency that could justify disregarding competitive bidding in contracting for repairs and new construction at the St. Croix prison. Just as with these court-ordered sewer repairs, the Government had been under District Court order to relieve prison overcrowding since the 1980s but did not seek a contract to do so until many years later. My ruling here that the Governor's sewer emergency declaration is invalid should come as no surprise to Ashley Andrews, since he was involved in this dispute as a principal of C & C/Manhattan.[11] C & C/Manhattan also got the contract to refurbish Government House on St. Croix, another project that ran into problems and resulted in large cost overruns.

The United States Attorney is correct: chronic conditions that have existed for years and have been the subject of repeated court hearings and orders are not an unforeseen condition or an unexpected occasion for action that would justify ignoring the competitive procurement requirements for a contract to protect the health and safety of the public. There simply was no emergency to warrant relaxing the ordinary procedures designed to qualify a contractor for these projects to make sure that the contract would be awarded to one who has the experience, technical competence, manpower and equipment to complete the task effectively within the given time constraints and at a fair cost.

As the Court of Appeals for the Third Circuit noted in affirming this Court, the "primary purpose of a competitive bidding statute is to protect against fraud, collusion, and favoritism in the issuance of public contracts." *General Eng.'g Corp. v. Virgin Islands WAPA,* 805 F.2d 88, 94 (3d Cir.1986), *aff'g* 21 V.I. 436, 636 F.Supp. 22. The Court of Appeals went on to observe that the award of the contract on a noncompetitive basis is more readily justified where there has been no suggestion of fraud or collusion or that the parties "were not dealing with each other at arm's

---

11. According to court documents, Andrews and C & C/Manhattan claimed that it was the low bidder. The Territorial Court ultimately dismissed the case because of confusion over which entity made the bid.

length, or that the bid ... tendered [was] rigged." *Id.* at 95. With the GRM contract, there is much more than the mere suggestion of fraud and collusion or mere allegations that GRM and the Government of the Virgin Islands were not dealing with each other at arm's length or that GRM's proposal was rigged. The facts of the case before me epitomize the need for competitive bidding in the administration of the public's business, for the "[c]ompetitive bidding laws originated in distrust of public officers whose duty it was to execute public contracts." These "laws are designed to prevent fraud, collusion, favoritism and improvidence in the administration of public business." *See General Eng'g Corp.*, 21 V.I. 464, 636 F.Supp. at 40.

What those competitive procurement procedures are designed to prevent is precisely what resulted here when they were circumvented: a flawed contract that did not protect the health and safety of the public or the pocket books of Virgin Islands taxpayers by insuring that the sewer repairs would be done competently, on time, and at a reasonable cost. The final contract signed by the Governor would have given GRM a full year to complete these critical, or by the Governor's definition, "emergency sewer repairs". The vague deadlines for completion stated in the respective scopes of work are not backed up by a liquidated damages penalty to enforce timely completion. GRM would have been penalized only if it did not do all the work within one year. Finally, the GRM contract would not have guaranteed

that the Government would get what it paid for, or put another way, that it would pay only for work done.

## VI. THE GRM CONTRACT VIOLATED THE COURT'S ORDER

██ My order of December 19, 2001, required that specific wastewater construction projects on St. Croix be completed by certain dates. Those dates were extended upon request of the Government by order on November 8, 2002. With the exception of the Lagoon Street Emergency Generator and discharge pipe, all work in St. Croix should have been completed by December 31, 2002. In October 2002, the Government awarded the construction contract covering these repairs to GRM, a company with no equipment, no experience, no assets, and no construction performance bond. Accordingly, the contract *did not comply with the clear requirements* of this Court's various orders.

## VII. UNFOUNDED ATTACKS ON THE UNITED STATES ATTORNEY

I cannot end this opinion without noting a former Virgin Islands legislator's outrageous assertions to the press that the United States Attorney was motivated by racial or anti-local prejudice to challenge the conflict of interest of the Governor's administrator in the procurement process and the validity of awarding this multi-million dollar contract to an assetless consulting company with no construction experience or equipment or employees.[12]

12.

[I]t is clear to me—and I hope it is clear to the community—that it is a racial trial .... All of the white companies that received a contract under the same consent decree and the same state of emergency as declared by the governor were not required to go through competitive bidding and were not required to get a bond.... Several of them had no equipment but intended to rent equipment as GRM intended to do.

Judi Shimel, *Written Arguments Next in Sewer Contract Case*, Sт. Thomas Source, Feb. 3, 2003, *available at* http://new.onepaper.com/stthomasvi/?v=d & i= & s=News:Local & p=59422 & f=p. It appears that all of these other St. Croix contracts were for professional services that do not require a bond. While the former legislator may not be expected to appreciate this distinction, it cannot be lost on Andrews inasmuch as he is an attorney and a named defendant in the *Gener-*

Such public comments maligning the motives of federal officials and, by implication, this Court, simply do not help solve the serious problems of sewage running in the streets and harbors of St. Croix. Moreover, this same legislator served in the Virgin Islands Legislature for years while the St. Croix waste-water system continued to deteriorate and the DPW budgets for equipment, staff and repair of these sewer projects were never adequately funded. Similarly, this former legislator's husband, Esdel Hansen, was a supervisor in DPW while the St. Croix waste water system continued to decline and deteriorate. Finally, I note that Andrews and Harris recruited Mr. Hansen to rescue St. Croix from its sewage woes only after this Court created a ready and reliable source of funds for these repairs.

To my great disappointment, Attorney General Stridiron has joined this public slander of the United States Attorney, although it is perhaps understandable that the Attorney General and Government of the Virgin Islands would react in anger when the United States Attorney brought the debacle of the GRM contract before this Court and the public. Attorney General Stridiron stated to the press that "[i]t started out by trying to slander the government of the Virgin Islands and ended up by trying to smear the governor of the Virgin Islands."[13] How can the United

States Attorney's actions be slanderous when the governor canceled the contract on the eve of the hearing on the United States' motion, undoubtably on the advice of the Attorney General?

The former Virgin Islands legislator and the present Virgin Islands Attorney General seem to have forgotten that it is the United States and this United States Court that have been trying to force the executive and legislative branches of the Virgin Islands Government to live up to their obligations to provide for the health and safety of the people of the Virgin Islands who elected them to office. Even in the face of substantial monetary penalties and threat of contempt of court for their failures, these elected and appointed officials have steadfastly refused to put the community's health and safety ahead of their crass political interests. One can only imagine how much worse the St. Croix and St. Thomas sewer systems would be today if these leaders had been left to their own devices and not been pushed so hard by the federal officials they now slander.

And to the extent the Attorney General's remarks were addressed to the Court, the record is clear that I have done everything I can in the circumstances to be respectful of the Governor and his elective position. Even at the contempt hearing, I allowed Governor Turnbull to address the Court unsworn from the podium and not under oath from the witness stand.[14] Un-

---

*al Engineering* case that discussed both the emergency and the professional services exceptions to the bidding requirements.

**13.** Attorney General Stridiron went on to assert to the print and electronic media: "Wait until the judge issues a ruling, and then I'll have a hell of a lot to say." Marty Schladen and Billy Shields, *Global Resources Estimated Millions in Cost Overruns before Getting Deal,* The Virgin Islands Daily News, Feb. 4, 2003, at 3; Judi Shimel, *Written Arguments Next in Sewer Contract Case,* St. Thomas Source, Feb. 3, 2003, *available at* http://new.onepaper.com/stthomasvi/?v=d & i= & s=News:Local & p=59422 & f=p.

I invite the Attorney General to state what he has to say in the courtroom from the podium, if it is of a legal, argumentative nature, or otherwise under oath from the witness stand.

**14.** Furthermore, I accommodated the Governor's request to speak to me in chambers, only to have that respect disregarded and those accommodations abused in intemperate pleadings filed by Attorney General Stridiron. The problem will not reoccur, because everyone, including the Governor if the occasion again arises, will respond in court under oath from the witness stand.

til these proceedings, I had taken Governor Turnbull at his word when he told the Court and the people of St. Croix and the Virgin Islands that the

> Government . . . from 1984 has not complied fully with cleaning up our solid waste or waste water. And even in my time we have tried, but we have not done all that we should have done. My people have not done all they should have done. They have not informed me fully on matters. However, I take the blame for that.
>
> But I want to assure this Court that I, at heart, am an environmentalist and a historical preservationist. And this territory is fragile. Its environment is fragile. And if we do not do the things that you have ordered, and other things, this would be no place for anyone to live.
>
> And I want to assure this Court, from my heart, that I intend to do all that must be done and find the necessary resources, even if we have to take them from some other areas. Because I think, Your Honor, this is paramount, because the Virgin Islands is our nest. And if we violate our nest, then we cannot survive.
>
> So I want to assure you that I'm going to do all I can. I don't—they say you should not micromanage. But I'm going to have to do some micromanaging in this area to make sure your orders are carried through, because you are perfectly right . . . .

(Ex. 1, Tr. of Oct. 18, 2001, at 5–6.)

I had truly hoped that the Court and the people of the Virgin Islands could depend upon the political will of Governor Turnbull and his administration to finally, once and for all, allocate the money and resources so desperately needed to solve the festering sewage problems that have plagued the Virgin Islands, especially St. Croix, for two decades.

## VIII. REMEDY AND RELIEF REQUESTED

In addition to seeking that the Government be enjoined from proceeding with or reviving the GRM contract, the United States has requested that any future contracts for repairs required by the Amended Decree, including any Exhibit A projects, shall comply with the competitive bidding requirements of Virgin Islands law unless there is a valid reason to bypass them and all applicable rules and regulations are followed to the letter. The United States also has asked that the Government comply with various other provisions of the Virgin Islands Code, file reports with the Court for those contracts in excess of $250,000, and promptly repair any new sewer system breakdowns which result in sewage bypasses. Finally, the United States has requested that this Court order the Government to hire a private contractor to operate and maintain the St. Croix waste water collection system and pump stations for at least the next eighteen months.

## IX. CONCLUSION

Based on the findings and conclusions set forth above, I will enjoin the defendant, the Government of the Virgin Islands, from proceeding with or reviving the contract with Global Resources Management, Inc., and will grant the additional relief and remedies requested by the United States.

It became clear at the status hearing that the Court's Corrective Action Trust Fund account needs attention. First of all, the Government must deposit forthwith the additional $5,000,000 to make up the original $16,000,000 the Court ordered to be deposited. There is no excuse for any further delay. Another $4,000,000 must also be deposited to cover additional projects not included in the initial $16,000,000.

Any unused funds in any other account associated with the Amended Decree shall be consolidated in the Court's Corrective Action Trust Fund account, and any funds which have been expended for St. Thomas projects must be replaced forthwith. The Government will give an updated report on the status of the account and the completion or progress on completion of the above items no later than March 31, 2003.[15]

## ORDER

Having considered the entire record in this matter, including the testimony and documentary evidence presented at the hearings on January 30, February 3 and 13, 2003, and based on the Memorandum of even date, it is hereby,

**ORDERED, ADJUDGED AND DECREED** that:

1. The defendant, Government of the Virgin Islands, is hereby permanently enjoined from proceeding with or reviving the contract with Global Resources Management, Inc.

2. The defendant Government shall competitively bid any new contracts for any wastewater projects/repairs required by the Amended Decree or this Court's Order of December 19, 2001 (as amended), including contracts for services or for the purchase of equipment and supplies, *unless* there is a *valid* factual and legal basis for avoiding the competitive bidding requirements pursuant to 31 V.I.C. § 239(a) and the relevant provisions of Title 31 of the Virgin Islands Rules and Regulations. If the defendant Government seeks to rely on 31 V.I.C. §§ 239(a)(1) or 239(a)(2), the defendant shall set forth the specific factual and legal basis for relying on these provisions in the contract and in the emergency proclamation as well, if the Government relies on section 239(a)(1).

3. In the event the defendant Government determines that any new contracts for any wastewater projects/repairs required by the Amended Decree or this Court's Order of December 19, 2001 (as amended), including contracts for services or for the purchase of equipment and supplies, will not be subject to the competitive bidding requirements of 31 V.I.C. § 236, based on one of the exceptions set forth in 31 V.I.C. § 239(a), the defendant shall comply with V.I. R. & Regs. tit 31:

§ 235-11, which requires that "all purchases and contracts ... whether by formal advertising or negotiation, shall be made on a competitive basis to the maximum extent practicable."

§ 235-91, which provides that no procurement in excess of $1,000 shall be made by negotiation "if the use of formal advertising is feasible and practicable under the existing conditions and circumstances even though such conditions and circumstances would otherwise satisfy the requirements of 31 V.I.C. § 239(a) *et seq.*"

§ 239, which provides, *inter alia,* that the Virgin Islands shall:

i. exert every reasonable effort to obtain the most favorable prices possible to the Virgin Islands (*see* § 239-2),

ii. ensure that the prospective contractor is responsible (*see* § 239-3),

iii. solicit written offers from all such qualified sources as are deemed necessary by the Commissioner of Property and Procurement to assure full and free competition, consistent with the purchase or contract and to the end that the purchase or contract will be made to the best advantage of the Virgin Islands, price and other factors considered (*see* § 239-4),

---

**15.** The new Agreed Modifications for Exhibit A Repairs filed by the Government on February 27, 2003, and the attached revised Exhibit A have been adopted by the Court in a separate order.

iv. consider, in conducting negotiations, the following factors, among other appropriate factors:

A. comparison of prices quoted and consideration of other prices for the same or similar property or services, with due regard to other factors related to the price, such as profits, cost of transportation and cash discounts,

B. comparison of the business reputation, capacity, and responsibility of the respective persons or firms who submit offers,

C. consideration of the quality of the purchase or contract including the same or similar previously furnished, with due regard to conformance with specification requirements,

D. consideration of the existing and potential workload of the supplier, and

E. consideration of past performance and ability to deliver when required (*see* § 239–4).

4. With respect to any new contracts for any wastewater projects/repairs required by the Amended Decree or this Court's Order of December 19, 2001 (as amended), including contracts for services or for the purchase of equipment and supplies, the defendant Government shall ensure that none of its employees is in violation of any conflicts of interest provisions of local law in connection with any such contract, including those of Chapter 37 of Title 3 of the Virgin Islands Code.

5. With respect to any new contracts in excess of $250,000, for any wastewater projects/repairs required by the Amended Decree or this Court's Order of December 19, 2001 (as amended), including contracts for services or for the purchase of equipment and supplies, the defendant Government shall file with the Court, within fif-teen (15) days of entering into each such contact, a notice including or attaching the following information:

a. the nature of the project/repair, the price of the contract, and the name, qualifications and prior experience of the contractor,

b. if the contract was entered into under the competitive bidding procedures of 31 V.I.C. § 236, a list of all of the bidders as well as the price quoted by each bidder,

c. if the contract was entered into in the open market without observing the competitive bidding requirements of 31 V.I.C. § 236, the specific factual and legal basis for avoiding the competitive bidding requirements of 31 V.I.C. § 236, the name of all persons that submitted bids with respect to the project/repair, and the amount of each such bid, and

d. a copy of the contract and all attachments thereto.

6. With respect to any new sewer system breakdowns which result in sewage bypasses after the date of this Order, the Government shall begin the repair of such breaks within sixty (60) days and shall complete such repairs within an additional sixty (60) days. If the defendant Government does not employ the competitive bidding requirements of 31 V.I.C. § 236 with respect to any such repairs, it shall comply with the requirements of Paragraph 3 above and shall obtain written price quotes from at least three contractors prior to selecting a contractor for the work.

7. Within ninety (90) days of the date of this Order, the Government shall enter into a contract with a qualified independent private contractor for the operation and maintenance of the pump stations and collection system on St. Croix for a period of eighteen (18) months. Such contractor shall manage the operation and maintenance of the pump stations and collection system on St. Croix on a day to day basis.

Before the expiration of the eighteen-month period, the United States shall recommend to the Court whether the operation and maintenance contract should be renewed, and the Court will determine whether the contract will be renewed with the same or a different private contractor.

8. No later than July 1, 2003, the defendant Government shall deposit the additional $5,000,000 (less the $1.6 million deposited after the February 13th hearing) in the Corrective Action Trust Fund, Banco Popular account, to make up its deficiency in the original $16,000,000 the Court ordered to be deposited. There is no excuse for any further delay. No later than October 1, 2003, the defendant Government shall deposit an additional $4,000,000 in the Corrective Action Trust Fund, Banco Popular account. Furthermore, any funds which have been expended for St. Thomas projects must be replaced forthwith. No later than March 31, 2003, the Government shall file with the Court an updated report on the status of any unused funds in any other accounts associated with the Amended Décree and submit any proposed orders to accomplish the consolidation of those funds in the Court's Corrective Action Trust Fund account.