## UNITED STATES OF AMERICA, Appellee
## v.
## GOVERNMENT OF THE VIRGIN ISLANDS, Appellant

No. 03-1727

United States Court of Appeals for the Third Circuit

April 2, 2004

HOWARD J. BASHMAN, (Argued), Fort Washington, Pa., IVER A. STRIDIRON, Attorney General, ELLIOTT DAVIS, Solicitor General, MICHAEL LAW, Assistant Attorney General Virgin Islands Department of Justice, St. Thomas, V.I., *Counsel for Appellant*

NINA DALE, Office of Regional Counsel, United States Environmental Protection Agency, New York, N.Y., THOMAS L. SANSONETTI, Assistant Attorney General, DAVID M. NISSMAN, United States Attorney, Virgin Islands, DAVID RAYMOND LEWIS, Deputy United States Attorney, Virgin Islands, WILLIAM D. DILLON, Assistant United States Attorney, Virgin Islands. JOHN A. BRYSON, DONALD G. FRANKEL, KATHERINE J. BARTON, (Argued), United States Department of Justice, Environment & Natural Resources Division, Appellate Section, Washington, D.C., *Counsel for Appellee*

NYGAARD, BECKER, and STAPLETON, *Circuit Judges*

## OPINION OF THE COURT

This is an appeal by the Government of the Virgin Islands (the "GVI") from an order of the District Court of the Virgin Islands in a Clean Water Act enforcement action brought by the United States pursuant to 33 U.S.C. § 1319(b). The case was commenced two decades ago, and in 1985, the United States and the GVI entered into a consent decree pursuant to which the GVI agreed to make certain improvements to its wastewater systems so as to come into compliance with effluent limitations in its discharge permits. The GVI repeatedly failed to comply with the consent decree's requirements, and in 1991, the United States filed a motion seeking enforcement of the consent decree. This

ultimately resulted in the parties entering into an amended decree in 1996 which placed new requirements on the GVI.

The GVI did not meet the requirements set forth in the amended decree, and raw sewage soon was bypassing the treatment plant and running down streets in St. Croix. In February of 2000, in response to the noncompliance, the United States moved the District Court to order the GVI to halt the discharge of raw sewage and to make necessary repairs. Acting on the motion, the District Court entered an order requiring specific repairs and restoration of the wastewater treatment plant, to be completed by deadlines set in the order.

Following a hearing on September 27, 2001, pursuant to an order of the District Court requiring the GVI to show cause why it should not be held in contempt "for its continued and flagrant failure" to comply with the decree and court orders, the Court issued further orders requiring compliance. The Governor of the Virgin Islands responded to these orders by declaring a state of emergency under 31 V.I. CODE § 239(a)(1), which allowed the Virgin Islands Department of Public Works ("DPW") to award contracts by negotiation rather than by competitive bidding. During the proclaimed state of emergency, the GVI entered into a negotiated contract with a company called Global Resources Management ("GRM"), which was to provide the services necessary to achieve compliance.

After further hearings the District Court found that the process leading to the GRM contract was likely tainted by political corruption, and that GRM itself was a start-up company with no equipment, assets, or experience in construction. The United States filed a motion to show cause why performance of the GRM contract should not be enjoined, and after still further proceedings, the District Court entered an order in March 2003 enjoining the GVI from proceeding with or reviving the GRM contract; setting deadlines for certain repairs; requiring the GVI to make a net deposit of $7.4 million into a trust fund to assure the repairs; and prescribing *procedures* for future use of emergency proclamations and contracting.

This appeal, which challenges that order, raises several issues. First, the GVI argues that the District Court lacked jurisdiction—on mootness grounds—to enjoin the contract between the GVI and GRM because the GVI had voluntarily terminated the contract two days before the hearing. We reject this contention because it is well established that the voluntary

766

cessation of a challenged practice will not automatically render a case moot, unless subsequent events make it absolutely clear that the wrongful behavior will not recur, a test not met here.

Second, the GVI submits that the District Court exceeded its jurisdiction, and in particular the strictures of the Eleventh Amendment, when it entered an injunction requiring the GVI to comply with territorial law in contracting for repairs to the wastewater system in St. Croix. In particular, the GVI relies on *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 79 L. Ed. 2d 67, 104 S. Ct. 900 (1984), in arguing that a federal court lacks jurisdiction to order a sovereign state or territory to conform its conduct to state or territorial law. The United States asserts two broad grounds for rejecting this assault on the District Court's jurisdiction: first, that the Eleventh Amendment does not apply to suits brought by the United States; and second, that the Virgin Islands is not a state for purposes of the Eleventh Amendment and hence lacks sovereign immunity. The United States also advances a narrower ground: that any potential Eleventh Amendment problem is obviated by the fact that the GVI consented to suit—and enforcement—in agreeing to the amended decree.

While these first two arguments have considerable force, we need not reach them, for we can dispose of the case on the narrower grounds stemming from the existence of the consent decree. The order that the District Court enforces is a federal decree implementing a federal statute. The enforcement order, itself entered in the exercise of broad equitable powers, was intended to vindicate an agreement made by territorial officials to comply with federal law. The District Court's construction of territorial law was therefore not the underpinning of its remedial order. More particularly, the Court's ordering the GVI (1) to factually and legally justify its future use of emergency proclamations; (2) to award contracts for projects exempted from the statutory competitive bidding procedures on a competitive basis and via formal advertising where practicable; (3) to solicit written offers from other qualified sources; (4) to consider certain factors in conducting contract negotiations; and (5) otherwise to attempt to ensure that contract prices are favorable and contractors are responsible, was entirely warranted by the Court's findings that the procedures used by the GVI to negotiate contracts for projects required by the December 2001 order were likely to frustrate compliance with that order. Thus, the District Court could require that

767

the GVI follow certain contracting procedures when awarding contracts for projects required pursuant to the amended decree. Under these circumstances, neither *Pennhurst* nor the Eleventh Amendment are implicated, much less offended.

Concluding that the District Court properly exercised jurisdiction, we reach the merits issues. The GVI asserts that the District Court abused its discretion in issuing an injunction because: (1) the emergency proclamations were valid; (2) the Court failed to defer to Virgin Islands agencies' contracting decisions; and (3) the Court lacked the legal authority to enter the specific injunctive relief granted. We disagree, and conclude that the District court did not abuse its discretion in enjoining the GRM contract or in ordering the GVI to comply with territorial competitive bidding law in future contracts under the amended decree or December 2001 order. In view of the long and sorry history of noncompliance and the seamy circumstances of the GRM contract, the District Court's order was surely within the ambit of its broad discretion. Indeed, the District Court correctly found that the GVI's award of the contract to GRM—a company "with no equipment, no experience, no assets, and no construction performance bond"—was likely to frustrate compliance with the amended decree and the December 2001 order, and that the "flawed contract" would not "protect the health and safety of the public ... by insuring that the sewer repairs would be done competently, on time, and at a reasonable cost." 248 F. Supp. 2d 420, 439. In view of the foregoing, the order enjoining the GRM contract and requiring the GVI to comply with territorial competitive bidding law in future contracts under the amended decree or December 2001 order was within the scope of the District Court's broad authority and did not constitute an abuse of discretion.

The final merits issue with which we must deal is whether the District Court abused its discretion in requiring the GVI to deposit an additional $7.4 million into the District Court's wastewater repair account. This was not among the relief the United States sought in its motion for an injunction, but the Court, at the behest of the United States Attorney, decided to tack on this additional relief to vindicate an earlier order with which the Court believed the GVI had fallen out of compliance. That order directed the GVI to complete compliance with certain provisions of the December 2001 order, and required the GVI to deposit into the trust fund the amount needed to implement the projects listed in an exhibit

attached to the order, an amount subsequently estimated by the GVI to be $16 million. The GVI did not appeal the December 2001 order then, and it does not challenge its validity now, and hence it is bound by the order. However, the $7.4 million consists of $4 million more than had previously been estimated or required (to cover additional projects and increased costs for projects not included in the original estimate), and the record seems devoid of any explanation of why the $4 million increase was necessary. We will therefore vacate that portion of the order, and remand so that the District Court can make findings of fact as to whether the $4 million increase is actually justified and conclusions of law as to whether it is proper. In all other respects, the order of the District Court will be affirmed.

## I. Facts and Procedural History

As we have noted, this case derives from a suit originally filed by the United States against the GVI in March 1984 for violations of the Clean Water Act ("CWA"). In 1985, the United States and the GVI entered into a consent decree, in which the GVI agreed to make certain improvements to its wastewater systems and to come into compliance with the effluent limitations in its discharge permits. The United States contends that the GVI repeatedly failed to comply with the consent decree's requirements, and the GVI itself admits that there was a "long period of inaction in complying with the terms of the consent decree." In 1991, the United States moved for enforcement of the consent decree, which ultimately resulted in the parties entering into an amended decree in 1996 that placed new requirements on the GVI.

Despite the entry of the amended decree, the GVI continued repeatedly to violate CWA effluent limitations due to its failure to properly operate and maintain its wastewater treatment plants. In addition, there were persistent pump station failures and broken sewer lines, particularly on St. Croix. The GVI has conceded that its failure to comply with the amended decree caused "nearly a complete and total breakdown of the St. Croix Waste Water Treatment facilities in 1999," so that sewage was bypassing the treatment plant, and raw sewage was running down the streets. The senior manager responsible for compliance with the amended decree stated that, upon starting her position in 1999, she was "shock[ed]" at the duration of the raw sewage bypasses. In addition, the St. Croix Waste Water Treatment Plant ("WWTP") was

769

discharging "dangerously septic" effluent into the Caribbean Sea, threatening permanent damage to the reef.

As a result of the failed compliance, in February of 2000, the United States moved the District Court to order the GVI to halt the discharge of raw sewage and make necessary repairs. In response to the motion, the District Court issued an order on February 12, 2000 requiring specific repairs and restoration of the wastewater treatment plant, to be completed by deadlines set in the order. On March 13, 2000, at the GVI's request, the District Court granted an extension of the deadlines set in the February 12, 2000 order. On April 28, 2000, the District Court found that the GVI had failed to comply with several aspects of its order and that the discharge of raw sewage had not been halted, and so on May 30, 2000, the District Court once again entered an order revising the deadlines. In issuing both the April and May orders, the District Court warned that contempt hearings would be held if the deadlines were not met.

During an August 29, 2000 inspection, the District Court noted that although the GVI had complied with portions of the Court's orders, the discharge of raw sewage continued, and again the Court set new deadlines. In an order dated December 13, 2000, the Court noted that, while some improvements had been made, the treatment system "is only marginally functional and continues to teeter on the edge of collapse as a result of inadequate attention from successive government administrations." 248 F. Supp. 2d at 425. The District Court once again issued revised deadlines that the GVI promised it could meet.

Nevertheless, the GVI did not comply with the amended decree and the District Court's orders. On September 27, 2001, the Court found that the GVI had allowed the St. Croix facilities to fall into a "state of dismal repair" and ordered it to show cause why it should not be held in contempt "for its continued and flagrant failure" to comply with the decree and court orders. At the show cause hearing on October 18, 2001, the Governor of the Virgin Islands conceded that the GVI had not complied with the Court's orders, that "things haven't been done right" for fifteen years, and that the GVI "ha[sn't] done what [it's] supposed to do." The Virgin Islands Attorney General admitted that the GVI had been merely "chicken-fixing" the sewer system. The Governor also reported to the Court that although the GVI had come into a $100 million

windfall due to an advance tax payment by a large taxpayer, only $250,000 of those funds had been allocated to wastewater treatment.

On December 19, 2001, the District Court issued an order requiring the Virgin Islands Department of Public Works (the "DPW") to complete certain repairs and projects by specific deadlines. The order also directed the GVI to determine the amount of funds needed to complete the projects and to deposit those funds into a trust fund dedicated to funding projects under the amended decree. Meanwhile, on October 9, 2001, the Governor had declared a state of emergency under 31 V.I. CODE § 239(a)(1). This emergency proclamation allowed the DPW to award contracts by negotiation rather than by competitive bidding. The proclamation declared a state of emergency for a ninety-day period and was followed by three subsequent proclamations that extended the state of emergency through mid-January 2003.

After the Court issued its order, the DPW had some discussions with two companies, Perma-Liner Industries, Inc. and Azurix, Inc., concerning implementation of the sewer repairs but did not competitively bid or advertise the contracts and did not receive bids for the scope of work eventually contained in the GRM contract. Rather it pursued a contract with GRM. The District Court, in findings of fact unchallenged by the GVI, found that the effort to obtain the contract was initiated by Ohanio Harris—a special assistant to Governor Charles Turnbull—who also served as president of GRM until March 2002. Harris initiated contract negotiations with DPW without ever revealing his personal association with GRM.

The Court found that the process leading to the GRM contract "reek[ed] of politics and political influence, and quite possibly of political corruption." 248 F. Supp. 2d at 422. It found that while the DPW staff disputed the scope of work in the contract and tried to include contract terms that would allow DPW to keep control of the quality, scope and cost of the work, they were "no match for the corrupting political pressure from the Turnbull Administration." *Id.* The Court particularly cited the involvement of Ohanio Harris, who not only initiated contract negotiations with GRM while he had a conflict of interest, but also kept pressure on DPW staff to move the GRM contract through the negotiation process.

The District Court found that the final contract was stripped of DPW's attached specifications for the work, contained no firm deadlines for the

included projects, and had no effective liquidated damages clause to enforce compliance with the vague deadlines that were included. In addition, the Court found that the contract contained an open-ended provision for cost overruns that was added after Ashley Andrews, an influential lawyer and also a GRM principal, proposed such a provision directly to the Governor. Finally, the Court found that GRM was a new company; lacked even operating licenses at the time negotiations were started; and had virtually no equipment, assets, or construction experience, let alone the specialized heavy civil construction experience required for the repairs.[1]

The GRM contract, in the amount of approximately $3.6 million, was signed by the Governor on December 20, 2002. DPW recommended that the Governor sign the contract but not release it, because GRM had not obtained a performance bond. On January 23, 2003, the United States filed a motion to show cause why performance of the GRM contract should not be enjoined. The motion made reference to the history of GRM and of the contract described above, and pointed out the lack of assurances that the contract would be performed in accordance with the contract specifications and the Court's December 2001 order, as amended. The United States' motion further asserted that the contract posed a risk of project failure and delay, which would result in an even greater risk of discharges of raw sewage and accompanying threats to the environment and human health. It is noteworthy that none of the sewer repairs required by the December 2001 order had been performed at the time the District Court ruled on the United States' motion, save for cleaning the manholes at one location. The unperformed work included repairs to one site from which tens of thousands of gallons of sewage per day had been flowing for two years, and another where a hole had been open in a sewer pipe for seven years.

On January 28, 2003, five days after the United States filed its motion for injunction, the Governor ordered that, "in the best interest" of the GVI, the contract should be terminated. The next day, the GVI moved to cancel the show cause hearing on the basis of mootness. The District

---

[1] We note in passing that a federal grand jury has recently indicted Harris, Andrews, and several other participants in GRM for, among other federal and territorial offenses, bribery, conspiracy, wire fraud, and violation of territorial conflict of interest laws. *See* Lee Williams, *Five Charged with Corruption over St. Croix Sewer Contract*, V.I. DAILY NEWS, Feb. 21, 2004, at 2-3.

Court denied the motion and held hearings on January 30 and February 3, 2003. On February 13, 2003, the Court held another hearing, on the status of the amended decree projects, which also addressed some matters pertaining to the GRM contract and the December 2001 order. In its March 2003 ruling on the motion to show cause (which is the subject of this appeal), the District Court found that the GRM contract would likely frustrate compliance with the December 2001 order. In brief, the Court concluded that the contract was entered into in violation: (1) of Virgin Islands law because the Governor had improperly invoked the state of emergency exception to the competitive bidding requirements, *id.* at 436-39; and (2) of the December 2001 order, *id.* at 439. The Court enjoined the GVI from proceeding with or reviving the GRM contract, set deadlines for certain repairs, and required the GVI to deposit $7.4 million into the trust fund.[2] The $7.4 million supposedly made up the deficiency in the original $16 million that the GVI had estimated was required to fund the projects identified in the December 2001 order, plus an additional $4 million to cover additional projects and increased costs not included in the original estimate. This appeal followed.

## II. Jurisdiction

The District Court had federal question jurisdiction under 48 U.S.C. § 1612(a). We have appellate jurisdiction over this interlocutory order pursuant to 28 U.S.C. § 1292(a)(1). However, the GVI contends that the District Court lacked jurisdiction to enjoin the contract on two separate Article III grounds. First, it contends that the Governor's voluntarily termination of the GRM contract prior to the hearing rendered the injunction proceeding moot. We exercise plenary review of a District Court's ruling on mootness. *See Ruocchio v. United Transp. Union,* 181 F.3d 376, 382 (3d Cir. 1999). Second, the GVI contends that the Eleventh Amendment or other related principles of sovereign immunity barred the District Court from directing the GVI to comply with territorial law. We also exercise plenary review of a District Court's ruling on immunity. *See Koslow v. Pennsylvania,* 302 F.3d 161, 167 (3d Cir. 2002). The parties dispute whether the immunity defense was ever raised in the District Court, but we need not resolve the issue as Eleventh

---

[2] This figure is the net of $9 million that the District Court actually ordered the GVI to deposit, and $1.6 million that had already been deposited.

Amendment immunity is relevant to jurisdiction and may be raised at and considered by the Court of Appeals in the first instance. *See Sullivan v. Barnett*, 139 F.3d 158, 178 (3d Cir. 1998), *rev'd on other grounds sub nom. Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 143 L. Ed. 2d 130, 119 S. Ct. 977 (1999).

## A. Mootness

Under Article III, section 2 of the U.S. Constitution, federal judicial power extends only to cases or controversies.[3] If a claim does not present a live case or controversy, the claim is moot, and a federal court lacks jurisdiction to hear it. *See United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396-97, 63 L. Ed. 2d 479, 100 S. Ct. 1202 (1980). As the United States points out, voluntary cessation does not automatically render the case moot. In *Friends of the Earth, Inc., v. Laidlaw Environmental Services*, 528 U.S. 167, 189, 145 L. Ed. 2d 610, 120 S. Ct. 693 (2000), the Supreme Court held that "it is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice'" (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 71 L. Ed. 2d 152, 102 S. Ct. 1070 (1982)). The standard for "determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (citing *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203, 21 L. Ed. 2d 344, 89 S. Ct. 361 (1968)). Moreover, the party alleging mootness bears the "heavy," even "formidable" burden of persuading the court that the challenged conduct cannot reasonably be expected to resume. *Id.* at 189-90.

In our view, the GVI has failed to meet its heavy burden of demonstrating that there is no reasonable expectation that it would again enter into a contract similar to the one at issue. The GVI submits that the record would not support a finding that it terminated the contract because of this litigation and that there was no probability that the contract would

---

[3] The District Court of the Virgin Islands is an Article IV court, but is authorized by statute to exercise jurisdiction equivalent to an Article III court. *See* 48 U.S.C. § 1612(a); *In re Jaritz Indus., Ltd.*, 151 F.3d 93, 96-98 (3d Cir. 1998).

.be reinstated. It also contends that the type of public statement made by the Governor is "quite weighty evidence that the Government of the Virgin Islands would not simply change its mind and attempt to reinstate the challenged contract after the district court dismissed the federal government's request for an injunction as moot." We are unpersuaded.

The timing of the contract termination—just five days after the United States moved to invalidate it, and just two days before the District Court's hearing on the motion—strongly suggests that the impending litigation was the cause of the termination. Additionally, the Governor's sole justification for the termination of the contract was that "such termination is in the best interest of the Government." But this statement is extremely general, and surely does not provide any assurance that a similar contract would not be entered into again. *Cf. Pennsylvania v. Porter*, 659 F.2d 306, 313 (3d Cir. 1981) (en banc) (holding that a case was not moot where city failed to provide assurance that policeman charged with misconduct would not be rehired or that challenged conduct would not be resumed). In short, the mere fact that the Governor has terminated a contract in this one instance with litigation lurking a couple of days away gives no assurance that a similar contract will not be entered into in the future.

Additionally, the GVI's continued defense of the validity and soundness of the contract prevents the mootness argument from carrying much weight. *See Sasnett v. Litscher*, 197 F.3d 290, 291-92 (7th Cir. 1999) (a voluntary alteration of a regulation does not moot case where State vigorously defends old regulation). In the District Court, the GVI proffered numerous factual findings to the effect that the contract was a "good deal," reasonable in price and scope of work, not untimely given the pressures on the GVI, and entered into in a legal manner. This stance does not bespeak of a genuine belief that the contract was of a type that would not be contemplated again.

 This case is much like *Dow Chem Co. v. United States EPA*, 605 F.2d 673, 679 (3d Cir. 1979), where we held that when a party does not change its "substantive stance" as to the validity of the contract but merely terminates it for allegedly purely practical reasons (such as avoiding litigation), the termination of the contract does not render the case moot. Because we agree with the United States that the voluntary termination of this particular contract did not clearly indicate that the GVI would not reenter this contract or enter a similar one in the future,

we hold that the District Court did not err in determining that the issue was not moot.

## B. Sovereign Immunity

As noted above, the GVI maintains that the District court exceeded its jurisdiction when it entered the injunction because of the strictures of the Eleventh Amendment in general and the Supreme Court's decision in *Pennhurst* in particular. The United States first counters that the Virgin Islands is not a state for purposes of the Eleventh Amendment. Territories are subject to the ultimate control of Congress, *United States v. Wheeler*, 435 U.S. 313, 319, 55 L. Ed. 2d 303, 98 S. Ct. 1079 (1978), and Congress exercised its authority to regulate and define the government of the Virgin Islands through the Organic Act, originally passed in 1936, and substantially revised in 1954 (when it became known as the Revised Organic Act ("ROA")). *See* 48 U.S.C. § 1541 *et seq*. The keystone of the government's argument is that while the ROA lists the specific provisions of the United States Constitution that are applicable to the Virgin Islands, it omits any mention of the Eleventh Amendment.[4] The United States argues that the deliberate omission of the Eleventh Amendment expresses Congress's intent to exclude the Virgin Islands from the protections afforded by that Amendment. *See Government of Virgin Islands v. Bryan*, 818 F.2d 1069, 1072 (3d Cir. 1987) (recognizing that any attributes of sovereignty the Virgin Islands has derive from the Revised Organic Act).

The GVI counters with cases such as *Harris v. Boreham*, 233 F.2d 110, 114-16, 3 V.I. 565 (3d Cir. 1956), and *Jackson v. West Indian Co.*, 35 V.I. 269, 944 F. Supp. 423, 429 n.6 (D.V.I. 1996), suggesting that these cases establish that the Virgin Islands possesses Eleventh

---

[4] The relevant section of the ROA reads:

> The following provisions of and amendments to the Constitution of the United States are hereby extended to the Virgin Islands to the extent that they have not been previously extended to that territory and shall have the same force and effect there as in the United States or in any State of the United States: article I, section 9, clauses 2 and 3; article IV, section 1 and section 2, clause 1; article VI, clause 3; the first to ninth amendments inclusive; the thirteenth amendment; the second sentence of section 1 of the fourteenth amendment; and the fifteenth and nineteenth amendments.

48 U.S.C. § 1561.

Amendment immunity.[5] Resolution of this question would have important consequence: If decided for the United States it would free suitors against the GVI from the strictures of *Ex parte Young*, 209 U.S. 123, 52 L. Ed. 714, 28 S. Ct. 441 (1908), with respect to suits for retroactive relief. *Cf. Edelman v. Jordan*, 415 U.S. 651, 39 L. Ed. 2d 662, 94 S. Ct. 1347 (1994). Fortunately, however, we need not decide the matter on this ground, or on the other broad ground asserted by the United States—that the Eleventh Amendment does not apply in suits brought by the United States[6]—because we find jurisdiction on a narrower basis, which revolves around the fact that this action springs from a consent decree.

As we have explained above, the order that the District Court enforces was a federal decree implementing a federal statute. The enforcement order, itself entered in the exercise of the District Court's broad equitable powers, was intended to vindicate an agreement made before the Court by territorial officials to comply with federal law. The Court's construction of territorial law was therefore not the underpinning of its remedial order. More particularly, the District Court's order—which we set out in the margin[7]—was warranted by the District Court's findings

---

[5] The United States would discount these cases. *Harris* merely established that Congress could create a territorial government for an unincorporated territory and confer upon it any autonomy similar to that of the states, and that the territorial body politic thus created may be endowed with attributes of sovereignty, such as nonliability to suit without its consent. It held that by the Organic Act of June 22, 1936, Congress did the same with respect to the two municipalities which then constituted the Virgin Islands. *Jackson* is a non-binding district court case in which the Court simply declared that "the Government of the Virgin Islands has an autonomy similar to that of a state, including such attributes as sovereign immunity." It is clear on the face of these cases that neither speaks to the Eleventh Amendment sovereign immunity question.

[6] The United States relies on cases such as *Arizona v. California*, 460 U.S. 605, 75 L. Ed. 2d 318, 103 S. Ct. 1382 (1983), and *United States ex rel. Santa Ana Indian Pueblo v. University of New Mexico*, 731 F.2d 703 (10th Cir. 1984).

[7] The Court ordered the GVI (1) to factually and legally justify its future use of emergency proclamations; (2) to award contracts for projects exempted from the statutory competitive bidding procedures on a competitive basis and via formal advertising where practicable; (3) to solicit written offers from other qualified sources; (4) to consider certain factors in conducting contract negotiations; and (5) otherwise to attempt to ensure that contract prices are favorable and contractors are responsible.

that the procedures used by the GVI to negotiate contracts for projects required by the December 2001 order were likely to frustrate compliance with that order. Thus, the District Court could require that the GVI follow certain contracting procedures when awarding contracts for projects required by the amended decree.[8]

Under these circumstances *Pennhurst* and the Eleventh Amendment simply are not implicated. This ground of decision is supported by the Supreme Court's recent opinion in *Frew v. Hawkins*, 157 L. Ed. 2d 855, 124 S. Ct. 899 (2004). In *Frew*, the question before the Court was whether the Eleventh Amendment bars enforcement of a federal consent decree entered into by state officials. The petitioners, mothers of children eligible for services under a federal benefits program in Texas, filed a civil action on behalf of their children pursuant to 42 U.S.C. § 1983, alleging that the Texas program did not satisfy the requirements of federal law, and seeking injunctive relief against various officers and agencies of the State of Texas. The individuals were sued in their official capacities and were represented throughout the litigation by the Texas attorney general. The claims against the state agencies were dismissed on Eleventh Amendment grounds. The state officials remained in the suit, and the District Court certified a class consisting of children in Texas entitled to services. Following extensive settlement negotiations, the petitioners and the state officials agreed to resolve the suit by entering into a consent decree. The District Court conducted a fairness hearing, after which it approved and entered the consent decree.

Two years after the consent decree was entered, the petitioners moved to enforce it in the District Court, alleging noncompliance. The officials denied the allegations and maintained that the Eleventh Amendment rendered the decree unenforceable even if they were not in compliance. The District Court rejected the Eleventh Amendment argument, but the Court of Appeals disagreed, reasoning that: (1) the program was good enough to comply with the general mandates of federal law; and (2) because the petitioners had not established a violation of federal law, the

---

[8] Though not critical to our analysis here, we note that this is true *a fortiori* when (1) the suit is brought by the United States, a greater sovereign, in its own courts, and (2) the injunctive decree is not only consistent with territorial law, but affirmatively incorporates it.

District Court lacked jurisdiction to remedy the consent decree violations.

The Supreme Court reversed, rejecting reliance on *Pennhurst*. Justice Kennedy wrote:

> Jurisdiction [in *Pennhurst*] was improper because "[a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law." Here, by contrast, the order to be enforced is a federal decree entered to implement a federal statute. The decree does implement the Medicaid statute in a highly detailed way, requiring the state officials to take some steps that the statute does not specifically require. The same could be said, however, of any effort to implement [a] general ... statute in a particular way. The decree reflects a choice among various ways that a State could implement the *Medicaid Act*. As a result, enforcing the decree vindicates an agreement that the state officials reached to comply with federal law.

*Id.* at 904-05 (quoting *Pennhurst*, 465 U.S. at 109) (second alteration in original) (citation omitted). He added: "In exercising their prospective powers under *Ex parte Young* and *Edelman v. Jordan*, federal courts are not reduced to issuing injunctions against state officers and hoping for compliance. Once issued, an injunction may be enforced ... ." *Id.* at 905 (quoting *Hutto v. Finney*, 437 U.S. 678, 690-91, 57 L. Ed. 2d 522, 98 S. Ct. 2565 (1978)) (alteration in original).

■ Finally, addressing the concern that enforcement of consent decrees can undermine the sovereign interest and accountability of state governments, Justice Kennedy explained that "when a federal court has entered a consent decree under *Ex parte Young*, the law's primary response to these concerns has its source not in the Eleventh Amendment but in the court's equitable powers and the direction given by the Federal Rules of Civil Procedure." *Id.*

■ These principles apply here. The remedial order entered by the (Federal) District Court was designed to enforce the consent decree, which remedied violations of the CWA, a federal statute. The order—which does not offend territorial law—to perform or refrain from performing certain acts was a reasonable exercise of the Court's equitable powers to enforce a federal decree to which the GVI had

779

consented. In the barest terms, "[o]nce entered, a consent decree may be enforced." *Id.*[9] In view of the foregoing analysis, we see no Eleventh Amendment obstacle to our jurisdiction, hence we turn to the merits.

## III. The Merits

### A. Enjoining the GRM Contract and Ordering the GVI to Comply with Territorial Competitive Bidding Law

The District Court found that allowing the GRM contract to go forward "would likely frustrate compliance and promote further noncompliance" with the December 2001 order for two alternative reasons: (1) it was entered into in violation of Virgin Islands law because the use of emergency proclamations to waive competitive bidding requirements was illegal; and (2) GRM "lacke[d] the experience and wherewithal" to perform the scope of work under the contract. 248 F. Supp. 2d at 437. The GVI contends that the District Court abused its discretion in making these findings because: (1) the emergency proclamations were valid and the District Court misconstrued the meaning of the word "emergency"; (2) the District Court failed to defer to the contracting decisions of Virgin Islands' agency personnel; and (3) under the CWA, the District Court lacked the legal authority to enter the specific injunctive relief it granted.

Given our conclusion that territorial law was not the basis for the injunction, the GVI's contentions about the emergency nature of the proclamation are not technically material to our determination of the effect of the GRM contract on the consent decree. However, to avoid the risk of staging Hamlet without the Prince, and to clarify the law for future reference, we dispose of (and reject) the GVI's contentions about the emergency in the margin.[10]

---

[9] Indeed, even if the GVI were able to benefit from Eleventh Amendment immunity in the original action, it waived that immunity when it agreed to the amended decree and failed to appeal the District Court's entry of judgment. *See, e.g., Del. Valley Citizens' Council for Clean Air v. Pennsylvania*, 678 F.2d 470, 475 (3d Cir. 1982).

[10] The GVI argues that the District Court somehow supplied an erroneous definition of the word "emergency" when determining that the Governor had misapplied the proclamation of a state of emergency. We disagree. In determining whether an "emergency" existed such that the Governor could declare a "state of emergency," the District Court correctly applied the definition of "emergency" as it was employed in an earlier District Court case which, like this action, involved an

## 1. Deference to the Agency Decision

The GVI contends that the District Court erred in not deferring to the GVI's discretion in selecting its own contractor. The United States responds on several grounds. First, it claims that the GVI cannot possibly request deference to an agency decision that its own Governor has reversed as "not in the best interest" of the Virgin Islands. While this line of reasoning has appeal, it is undermined by the fact that the United States also claims that this was a pretextual statement made in order to terminate the contract in order to avoid litigation.

The United States does, however, advance a number of cogent arguments that demonstrate why no deference was due. Strongest among them is the fact that, as the GVI itself explains, deference is due only where "the negotiation was essentially fair." In this case, the District Court made numerous factual findings establishing that the negotiation was fraught with political influence and possibly corruption. These findings are supported by the evidence. Under these circumstances, we do not see on what basis deference could be owed, given the District Court's conclusion that there was bad faith in the contract negotiations. *See Scanwell Labs., Inc. v. Shaffer*, 137 U.S. App. D.C. 371, 424 F.2d 859, 874 (D.C. Cir. 1970) (opining, in a government contracting case

---

emergency exception to competitive bidding requirements under Virgin Islands law. In *General Engineering Corp. v. Virgin Islands Water & Power Authority*, 636 F. Supp. 22, 45, 21 V.I. 436 (D.V.I. 1985), *aff'd* 805 F.2d 88 (3d Cir. 1986), Judge O'Brien, also construing the competitive bidding requirement for public expenditures in the Virgin Islands, defined an "emergency" as "[a] sudden unexpected happening; an unforeseen occurrence or condition; perplexing contingency or complication of circumstances, a sudden or unexpected occasion for action; exigency; pressing necessity. Emergency is an unforeseen combination of circumstances that calls for immediate action." (quoting BLACK'S LAW DICTIONARY 469 (rev. 5th ed. 1979)).

We accept that definition. The conditions here were hardly "unexpected"; rather they were the result of nearly twenty years of neglect and noncompliance with court orders to fix the growing problems in the Virgin Islands wastewater system. It was therefore not an "emergency" that led to the proclamation of the state of emergency and to the contract with GRM. Despite the GVI's creative attempts to demonstrate that nothing would ever be an emergency if we adopted this reasoning, we agree with the District Court that, given that the Virgin Islands had been under court order since 1985 to construct, repair, and maintain its wastewater facilities, the complete deterioration that occurred could not be construed as surprising or unexpected.

with overtones of illegal activity, "[w]hen the bounds of discretion give way to the stricter boundaries of law, administrative discretion gives way to judicial review").

Additionally, regardless of any finding of bad faith or conflict of interest, deference is not due in the absence of a reasoned administrative explanation or interpretation. *See Dist. 1199P, Nat'l Union of Hosp. & Health Care Employees v. NLRB*, 864 F.2d 1096, 1098 (3d Cir. 1989) (review is possible only when the agency provides a reasoned explanation of its actions). Here, the emergency proclamations at issue were devoid of any justification for why a state of emergency existed with respect to the repairs that were required to be undertaken under the December 2001 order.

## 2. Scope of the CWA's Grant of Authority

Section 309(b) of the CWA provides that: "The Administrator is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction for any violation for which he is authorized to issue a compliance order under subsection (a) of this section." 33 U.S.C. § 1319(b). The GVI argues that the CWA does "not grant the federal government the power to order a State or Territory not to enter into a contract with a given contractor, nor does it empower the federal government to order a State or Territory to adhere to state or territorial law." It is true that subsection (a) does not provide detailed guidance on what types of relief are, in fact, affordable. Nonetheless, we are unpersuaded that the lack of an explicit grant of power to enjoin the contract in this case means that the power is, in fact, lacking.

Since the CWA does not define the scope of a District Court's authority to enforce a decree and a Court's orders issued pursuant to it, the question shifts from what the CWA does or does not explicitly permit to what the Court's power is to ensure that its decrees and orders are obeyed. *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 522, 92 L. Ed. 2d 405, 106 S. Ct. 3063 (1986) ("[I]t is the agreement of the parties, rather than the force of law upon which the complaint was originally based, that creates the obligations embodied in a consent decree."); *see also United States v. Local 359, United Seafood Workers*, 55 F.3d 64, 69 (2d Cir. 1995) ("[A] consent decree ..., by its very nature, vests the court with equitable discretion to enforce the obligations imposed upon the parties."); *EEOC v. Local 580, Int'l Ass'n*

*of Bridge, Structural & Ornamental Ironworkers*, 925 F.2d 588, 593 (2d Cir. 1991) ("Where equitable remedies which exceed the confines of the consent judgment are reasonably imposed in order to secure compliance of the parties, the court has not overstepped its bounds, and its orders must be obeyed.").

· The District Court found that the GRM contract would frustrate compliance because the lack of competitive bidding was responsible for an inadequate contract with a company that was not equipped to do the work. We need not rescribe the District Court's supported findings about GRM and the circumstances of the contract, but incorporate them here. *See generally* 248 F. Supp. 2d at 426-36.

The forward-looking component of the District Court's injunction—in which it enjoined the GVI to comply with various territorial law competitive bidding provisions—presents a somewhat different question, but here again we are satisfied that the District Court· acted within its sound discretion. As we explain above, the analysis concentrates on ends, not on means: The question is not whether territorial officials are, as a literal matter, enjoined to comply with territorial law, but rather· whether such an injunction serves to enforce the amended decree. And as the Court explained in *Frew*, this is measured by the traditional rules about the court's equitable powers and the process granted by the Federal Rules of Civil Procedure. 124 S. Ct. at 905-06. Thus, we must ask whether an order directing the GVI to comply with territorial competitive· bidding law will vindicate the amended decree. We conclude that it is reasonably calculated to do so.

■ Simply put, Virgin Islands law articulates sound procedures that result in contracts that serve the public interest. The District Court was right to enjoin the GVI to follow territorial law not because it was the law, but because it was a good set of procedures suited to the problem at hand and familiar to the enjoined party. As the District Court explained, Virgin Islands competitive bidding procedures "are designed to prevent ... precisely what resulted here when they were circumvented." 248 F. Supp. 2d at 439. The District Court determined that Virgin Islands law was the best medicine for the persistent noncompliance afflicting the. GVI. After two decades of litigation, years of flagrant violations, and too many promises with no real progress, the Court was correct in concluding that the GVI needed clear guidelines to set it on a steady course to fulfill its obligations under the amended decree. Territorial law

provided a suitable source for such guidelines. Moreover, the District Court's incorporation of territorial competitive bidding law preserves a measure of federal-territorial comity, because a custom-written decree might have subjected the GVI to inconsistent territorial-law and federal injunctive obligations.

In view of all this, and in terms of the question as we have framed it, we are satisfied that the District Court did not abuse its discretion in enjoining the GRM contract or in setting forth procedures—here compliance with territorial law—that the GVI would have to follow in awarding future projects pursuant to the amended decree.

## B. The Trust Fund Deposit

The GVI contends that the District Court lacked power to order it to deposit money in the trust fund, because a federal court cannot order obligation of funds for which there is no appropriation. *See Rochester Pure Waters Dist. v. EPA*, 295 U.S. App. D.C. 121, 960 F.2d 180, 184 (D.C. Cir. 1992). The GVI also argues that the order is improper because the party being sued, the executive branch of the government, cannot obligate or appropriate funds since that is the exclusive province of the legislative branch.

Whatever the merits of these contentions may be, the United States convincingly argues that the order to deposit $7.4 million was made not pursuant to its motion for injunctive relief, but rather to force compliance with the District Court's earlier order of December 2001. The GVI did not appeal the December 2001 order then, nor does it challenge its validity now, and the United States submits that because the GVI did not appeal the December 2001 order, the GVI is bound by its terms, barring its challenge to the deposit requirement. *See Del. River Port Auth. v. FOP, Penn-Jersey Lodge 30*, 290 F.3d 567, 572 (3d Cir. 2002) ("[I]ssue preclusion prevents relitigation of the same issues in a later case."); *United States v. Millstone Enters. Inc.*, 864 F.2d 21, 23 (3d Cir. 1988) (holding that *res judicata* precludes relitigation of issue that was or could have been decided in enforcement order that was not appealed). We agree. Furthermore, at the October 2001 hearing which resulted in the December 2001 order, the Virgin Islands Attorney General said: "I think setting up that kind of account would help tremendously." Thus, there is no basis on which to challenge the existence of the trust fund or the order to deposit money into it.

What is also significant, however, is that the $7.4 million the District Court ordered the GVI to deposit in the trust fund includes $4 million more than had previously been estimated or required. The United States argues that the extra $4 million was necessary because the original $16 million estimate proved to be insufficient to fund all the work required by the order. It describes the additional sum as funding to cover "additional projects" and increased costs for projects not included in the original estimate. However, we agree with the GVI that the record is devoid of any cogent explanation of why the $4 million increase was necessary. Moreover, it is not clear whether the increase can be legally justified. Thus, although the GVI cannot now challenge the original order requiring the $16 million deposit, we must remand as to the requirement to deposit the additional $4 million so that the District Court can make findings of fact and conclusions of law which may (or may not) support the $4 million increase.

## IV. Conclusion

For the foregoing reasons, the order of the District Court will be affirmed, except to the extent that it ordered the deposit of $4 million more than had previously been required. To that extent, the order will be vacated and the case remanded for further proceedings consistent with this opinion.